**James H. PICKREN and Lucie B. Pickren, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 23514.

United States Court of Appeals Fifth Circuit.

May 29, 1967.

William R. Frazier, Jacksonville, Fla., for appellants.

Mitchell Rogovin, Richard M. Roberts, Act. Asst. Attys. Gen., Lee A. Jackson, Harry Baum, Howard J. Feldman, Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Tampa, Fla., for appellee.

Before PHILLIPS,* THORNBERRY and DYER, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

James H. Pickren and Lucie B. Pickren are husband and wife. Hereinafter, they will be referred to jointly as the Pickrens, and James H. Pickren will be referred to as Pickren.

The Pickrens brought this action to recover refunds of income taxes paid by them for the years 1959, 1960, and 1961. From an adverse judgment, they have appealed.

The facts are not in dispute and are as follows: On July 1, 1957, Pickren and S. Arthur Hooker were the joint owners of certain secret formulas and trade names, which they had then held for more than six months. The formulas were used to prepare liquid wax products, which were used to lubricate furniture drawers. The formulas were not patentable, but attempts by competitors to ascertain the secrets of the formulas and make the products derived therefrom had proven unsuccessful.

Between 1947 and 1950, the stock of Freit Laboratories,[1] a Florida corporation, was owned by the Pickrens. The products resulting from an application of the formulas were manufactured and sold by Freit. In 1950, Hooker purchased a one-half interest of the stock of Freit and a one-half interest in the formulas from Pickren. A disagreement between Pickren and Hooker resulted in the transfer on July 1, 1957, by the Pickrens of all the stock in Freit to Hooker and T. B. Jones. Thereafter, the Pickrens had no interest, either as officers, directors, or stockholders in Freit. Concurrent with the sale of the stock, an agreement was entered into in which Pickren was designated as the First Party, Hooker as the Second Party, and Freit as the Third Party. The agree-

---

\* Of the Tenth Circuit, sitting by designation.

1. Hereinafter referred to as Freit.

ment recited that the First and Second Parties were joint owners of the formulas, the products of which were sold under trade names, which were set forth in the agreement, and that the Third Party was desirous of acquiring with reference to such formulas and trade names "certain rights as hereinafter specified." The agreement provided that:

"The First Party and the Second Party hereby grant unto the Third Party the exclusive right and license, for a period of twenty-five (25) years, to manufacture, or have manufactured, use and sell, or have sold, the products derived from the aforementioned secret formulas, as well as the exclusive right to use the abovementioned trade names, throughout the United States and all foreign countries."

It further provided that "during the life of" the "Agreement," the Third Party agreed to pay to the First Party, his heirs or assigns, a royalty amounting to 10 cents on each gallon of the product derived from such secret formulas that the Third Party should dispose of or sell or have sold, until the aggregate of such sums paid should equal the sum of $45,000, and that "during the life of" the "Agreement," the Third Party agreed to pay to the Second Party, his heirs or assigns, a royalty amounting to 10 cents on each gallon of the product derived from such secret formulas that the Third Party should dispose of or sell or have sold, but that no payments to the Second Party should be made until the aggregate of such sums paid to the First Party, his heirs or assigns, should equal the sum of $45,000, and that should the Third Party assign its rights under the agreement, it should pay to the First Party the balance of the sum of $45,000 then unpaid; and that the Third Party should not reveal or divulge the formulas to any other person or corporation, except those individuals or corporations now or in the future manufacturing the products derived from such formulas "so long as any portion of the monies hereinbefore mentioned remain unpaid," and that the Third Party would enter into a contract with each such individual or corporation containing a clause making such individual or corporation responsible to the Third Party for any disclosure of such formulas in the sum of $10,000 as liquidated damages.

The agreement further provided that:

"None of the parties to this Agreement shall reveal or divulge the aforementioned formulas to any individual or corporation with the exception of those individuals or corporations hereinabove mentioned so long as this Agreement is in force and effect";

and that a party to the agreement who divulged or revealed such formulas should be liable to the other party or parties in the sum of $10,000 as liquidated damages; and that the First Party and Second Party should surrender to the Third Party all memoranda and data concerning such formulas and keep secret and confidential all information known to the First Party and Second Party concerning such formulas.

It further provided that the First Party and Second Party, absent a material breach of the agreement by the Third Party, would not "directly or indirectly carry on, be engaged or interested in" any business competitive in nature with that of producing the products derived from such formulas; that the Third Party would produce and manufacture the products derived from such formulas in such quantities as were necessary to meet without unreasonable delay all demands for the same; and that upon the failure of the Third Party to produce and manufacture, or cause to be produced and manufactured, such products for a period of 90 days, "the First Party and Second Party" should "declare such failure as a material breach of" the "Agreement by the Third Party and after ninety (90) days written notice of such breach, during which time the breach or default" could "be remedied by payment of all sums then due," the agreement should be null and void and the formulas would be returned to the First Party and the Second Party; and that a failure of the Third Party to make the payments pro-

vided for in the agreement to the First Party might be declared by the latter to be a material breach of the agreement, and if so declared, written notice of such breach should be given to the Third Party, and if it did not within 90 days thereafter, remedy such breach by paying all monies then due, the agreement should be null and void and all of the formulas should be returned to the First Party and the Second Party.

The Pickrens received royalties of $6,106.10, $5,491.40, and $4,571.40 under such agreement in the years 1959, 1960, and 1961.

On March 4, 1963, a contract was entered into in which Hooker was designated as the party of the first part, Pickren as the party of the second part, and Freit as the party of the third part. It recited that on July 1, 1957, the party of the first part and the party of the second part entered into an agreement with the party of the third part, by which the party of the first part and the party of the second part granted to the party of the third part the exclusive right and license for a period of 25 years to manufacture or have manufactured, use and sell, the products derived from the secret formulas and processes "of the party of the first part and party of the second part, as well as the exclusive right to use" the trade names set out in such agreement, and that the party of the second part was "desirous of selling *all of his rights, title and interest* in and to the aforementioned secret formulas, processes, inventions and trade names, that the party of the first part and party of the second part jointly own, to the party of the third part" and that "the party of the third part is desirous of purchasing *all of the rights, title and interest* of the party of the second part in and to the said secret formulas, processes, inventions, and trade names"; and that the party of the first part (Hooker) joined in the agreement "to show his consent for the party of the second part (Pickren) to sell all of his rights, title and interest in and to the said secret formu-

las, processes, inventions, and trade names to the party of the third part." (Italics ours.)

It provided that the contract of July 1, 1957, should be rescinded, canceled and annulled, and that the party of the third part "does hereby purchase from the party of the second part and the party of the second part does hereby sell, grant and convey, assign, set over and transfer to the party of the third part all of his rights, title and interest in and to all" of such formulas, processes, trade names and inventions "that are jointly owned by the party of the first part and party of the second part"; and that the party of the third part should pay to the party of the second part as the purchase price $8,200 in installments, at the times provided in the contract.

Such contract further provided that the party of the second part "will never directly or indirectly at any time hereafter impart or disclose knowledge or information" of such "formulas, processes, trade names or improvements thereon, to any person except those persons designated by the party of the third part," and that the party of the second part represented and warranted that he had not at any time divulged or imparted the secret formulas, processes or any part thereof to any person or corporation whatsoever, "other than the agreement" of July 1, 1957, and that the party of the second part represented and warranted that "he is the absolute owner of one-half (½) interest in" such secret formulas, processes and trade names.

In their joint tax returns for the years 1959, 1960, and 1961, the Pickrens returned the amounts received under the July 1, 1957, agreement as long term capital gains. The Commissioner of Internal Revenue determined that such income receipts were not gain from the sale of capital assets and were ordinary income and assessed deficiencies accordingly. The deficiencies were paid and claims for refund were timely filed. The refunds were not paid and this action followed.

■ Secret formulas and trade names are sufficiently akin to patents to warrant the application, by analogy, of the tax law that has been developed relating to the transfer of patent rights, in tax cases involving transfers of secret formulas and trade names.[2]

Section 61(a) of the Internal Revenue Code of 1954, in part here pertinent, reads as follows:

"§ 61. *Gross income defined.*

"(a) *General definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\* \* \* \* \* \*

"(6) Royalties;

\* \* \* \* \* \*

(26 U.S.C. 1964 ed., § 61.)

Section 1222 of such Code, in part here pertinent, reads as follows:

"§ 1222. *Other terms relating to capital gains and losses.*

"For purposes of this subtitle—

\* \* \* \* \* \*

"(3) *Long-term capital gain.*—The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income."

(26 U.S.C. 1964 ed., § 1222.)

Section 1235 of such Code, in part here pertinent, reads as follows:

"§ 1235. *Sale or exchange of patents.*

"(a) *General.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred."

(26 U.S.C. 1964 ed., § 1235.)

■ The secret formulas and trade names were capital assets, and on July 1, 1957, they had been held by Pickren and Hooker for more than six months.

The payments made by Freit to the Pickrens in 1959, 1960, and 1961 were taxable as long-term capital gains, if the agreement of July 1, 1957, effected a transfer to Freit of all substantial rights in the formulas and trade names. If not, they were taxable as ordinary income.[3]

■ The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention. Where the meaning of the contract is not plain and its terms are ambiguous, the court should place itself as nearly as may be in the position of the parties when their minds met upon the terms of the contract, and from a consideration of the writing itself, of its purposes, and of the circumstances which attended its making, endeavor to ascertain the true intent of the parties.[4]

2. E. I. Du Pont De Nemours and Company v. United States, Ct.Cl., 288 F.2d 904, 912;
Stalker Corporation v. United States, D.C.E.D.Mich., 209 F.Supp. 30, 33;
Hopkins v. United States, 82 F.Supp. 1015, 1022, 113 Ct.Cl. 217;
See also: Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 266, 78 S.Ct. 691, 2 L.Ed.2d 743.

3. Moberg v. C. I. R., 5 Cir., 365 F.2d 337, 339;

Bannister v. United States, 5 Cir., 262 F.2d 175, 178;
Storm v. United States, 5 Cir., 243 F.2d 708, 711.

4. New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65, 69;
W. C. Shepherd Co. v. Royal Indemnity Co., 5 Cir., 192 F.2d 710, 715;
Roosevelt Materials Company v. Nolan Brothers, Inc., 10 Cir., 264 F.2d 807, 809.

■ In determining the intention of the parties to a contract, the court should consider the language of the contract in its entirety.[5]

■ In determining whether an instrument only gives a license to use an invention or a secret formula or transfers all the substantial rights to such patent or secret formula, the terminology used may be of great importance.[6]

■ Where the language of the contract is ambiguous, the practical construction which the parties themselves placed on the contract is entitled to great weight in determining its meaning.[7]

Here, the language of the agreement of July 1, 1957, is significant. It first recites that Pickren and Hooker are joint owners of the formulas and trade names and that Freit is desirous of acquiring *"certain rights"* with reference to such formulas and trade names, not all the rights thereto. By its language it granted to Freit not rights in and to the secret formulas and trade names, but only the exclusive right and license "to manufacture, or have manufactured, use and sell, or have sold, *the products derived from"* such *"secret formulas"* and "the exclusive right *to use* the * * * trade names" throughout the United States and foreign countries. (Italics ours.)

Such rights to manufacture, or have manufactured, use and sell, or have sold such products, or to use such trade names, were limited to 25 years, and they could have been terminated much earlier by the event of an unremedied default by Freit.

Attempts of competitors to ascertain the secrets of the formulas and make the products derived therefrom have proven wholly unsuccessful.

■ It would seem, therefore, that on the date the agreement was entered into, the secret formulas had a useful life that would extend more than 25 years from such date. We discern no facts on the record that would warrant a contrary conclusion. Of course, the life of a secret formula is not limited, as is a patent, by the Patent Act.

Moreover, the agreement contains provisions to insure Freit's manufacturers would not divulge such formulas. The agreement provides that "none of the parties" thereto "shall reveal or divulge the * * * formulas to any individual or corporation," other than Freit's manufacturers "so long as" the agreement "is in force and effect."

■ We are unable to determine why the agreement not to reveal or divulge the formulas was limited to the time the agreement should be in force and effect. The agreement could have terminated a comparatively short time after it was entered into by the unremedied default of Freit. It would seem unrealistic that the parties intended on termination of Freit's rights under the contract that it would be free to divulge the formulas. Of course, because of the prior confidential relationship, Freit would be under a legal duty after the agreement ceased to be in force and effect not to divulge the formulas.[8] Perhaps the first party and second party chose to rely on that legal duty, or Freit was unwilling to bind itself to pay liquidated damages for a disclosure made by it after the contract had terminated.

5. Lion Oil Co. v. Gulf Oil Corp., 5 Cir., 181 F.2d 731, 733;
  Insurance Co. of North America v. Delafield, 5 Cir., 278 F.2d 683, 685.

6. E. W. Bliss Co. v. United States, 253 U.S. 187, 192, 40 S.Ct. 455, 64 L.Ed. 852.

7. Travelers Indemnity Company v. Holman, 5 Cir., 330 F.2d 142, 149;
  Navajo Production Corporation v. Panhandle Eastern Pipe Line Co., 5 Cir., 132 F.2d 1, 3;

  Commercial Standard Ins. Co. v. Remer, 10 Cir., 119 F.2d 66, 70;
  Lawrence Nat. Bank v. Rice, 10 Cir., 82 F.2d 28, 33;
  Lackey v. Ohio Oil Co., 10 Cir., 138 F.2d 449, 451.

8. Bofors v. United States, U.S.App.D.C., 194 F.2d 145;
  Smith v. Dravo, 7 Cir., 203 F.2d 369, 375;
  Restatement, Torts, § 757.

 The language of the contract of March 4, 1963, is likewise significant. It recites that by the agreement of July 1, 1957, Hooker and Pickren granted to Freit "the exclusive right and license for a period of twenty-five (25) years to manufacture, or have manufactured, use and sell, the products derived from the secret formulas and processes of the party of the first part (Hooker) and party of the second part (Pickren). The preposition "of" in its context means "belonging to." Webster's New International Dictionary, 2nd Ed. It further recites that "the party of the second part is desirous of selling all of his rights, title and interest in and to the aforementioned secret formulas, processes, inventions and trade names, that *the party of the first part and party of the second part jointly own*, to the party of the third part under the terms and conditions hereinafter set forth, and the party of the third part is desirous of purchasing all of the rights, title and interest of the party of the second part in and to the said secret formulas, processes, inventions, and trade names." And it further provides that "the party of the third part (Freit) does hereby purchase from the party of the second part and the party of the second part does hereby sell, grant and convey, assign, set over and transfer to the party of the third part *all of his rights, title and interest in and to all of the secret formulas, processes, trade names and inventions that are jointly owned by the party of the first part and party of the second part by virtue of the"* agreements of April 24, 1950,[9] and *July 1, 1957.* And it further provides that "the party of the second part represents and warrants that he has not at any time divulged or imparted the secret formulas, processes or any part thereof to any person or corporation whatsoever, other than the agreement that parties hereto entered into on July 1, 1957, and the party of the second part further represents and warrants that he is the *absolute owner* of one-half (½) interest in the said secret formulas, processes, and trade names, free and clear of any and all liens, charges, claims and demands." (Italics ours.)

The italicized language would be entirely inappropriate if the agreement of July 1, 1957, transferred all substantial rights to the secret formulas and trade names.

The language of the agreement of July 1, 1957, when considered in its entirety and in the light of the practical construction placed thereon by the parties thereto in their contract of March 4, 1963, leads us to conclude that such agreement did not effect a transfer of all the substantial rights of Pickren and Hooker in such formulas and trade names to Freit, and that the payments made thereunder to the Pickrens were ordinary income.

Affirmed.

---

9. Being the agreement by which Hooker purchased a one-half interest in the formulas from Pickren.