HOOKER CHEMICALS AND PLASTICS
CORPORATION

v.

The UNITED STATES.

No. 452–71.

United States Court of Claims.

Jan. 24, 1979.

Raphael Sherfy, Washington, D. C., attorney of record, for plaintiff; Miller & Chevalier, James R. Ron, Los Angeles, Cal., and Robert D. Heyde, Washington D. C., of counsel.

Michael J. Dennis, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and SMITH, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's motion, filed October 27, 1978, requesting that the court adopt the recommended decision of Trial Judge Robert J. Yock, filed June 13, 1978, pursuant to Rule 134(h), as the basis for its judgment in this case, defendant having withdrawn its previously filed notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, the court concludes as a matter of law that the plaintiff may treat the proceeds received from the transfers as long-term capital gain. In so concluding, the court has relied heavily on the fact that plaintiff's reservation of the "right to import" into the exclusive territories of transferee corporations was not a reservation of a substantial right of value under the particular facts of this case. Because the "right to import" was of no practical value to plaintiff, it was deemed not to defeat the "sale" status of the transaction.

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report, filed June 13, 1978, they are not printed

Therefore, plaintiff is entitled to recover the difference between ordinary income tax treatment accorded it on receipts of $60,042.62 in its 1963 fiscal year and the amount that would be due if capital gains tax treatment had been accorded it, together with interest as provided by law, and judgment is entered to that effect. The full amount of recovery will be determined in further proceedings pursuant to Rule 131(c).

Plaintiff's remaining claims for FY 1962 and 1963, according to the parties' stipulation, are hereby dismissed with prejudice.

## OPINION OF THE TRIAL JUDGE

YOCK, Trial Judge:

This is an action for the recovery of a portion of the federal income taxes paid by plaintiff for its fiscal year ending November 30, 1963, plus interest as provided by law. Jurisdiction is based on 28 U.S.C. § 1491. The case presents one basic issue: whether payments received by the plaintiff in exchange for the transfer of certain patent rights and know-how is taxable as ordinary income, as argued by the Government, or deserves long-term capital gains treatment, as contended by the plaintiff. For the reasons set forth below, it is concluded that plaintiff is entitled to recover.

### Facts

Plaintiff, Hooker Chemicals and Plastics Corporation ("Hooker"), is a New York corporation involved in the manufacture and sale of chemicals and related products. In 1962, Hooker underwent a consolidation with the Parker Rust Proof Company ("Parker") in which Hooker acquired Parker. Parker had been, since 1914, involved in the development, manufacture, and sale of chemical products and processes for metal treating and rustproofing, and operated as a division of Hooker after the consolidation.

herein since such facts as are necessary to the decision are contained in his opinion.

Parker had for years beginning in the 1920's, maintained relationships with certain foreign corporations in Europe whereby they used Parker technology, trademarks, and patents in specified foreign countries. In 1952, Parker entered into agreements with Societe Continentale Parker ("SCP"), a French corporation, and Metallgesellschaft Aktiengesellschaft ("MG"), a German corporation, in which Parker licensed some of its technology and patents to them for their use in different parts of Europe.

The 1952 agreements were for 10 years, and in 1962, shortly after the consolidation between Hooker and Parker, Hooker terminated the agreements. There followed a period of negotiation which Hooker hoped would culminate in new agreements with MG and SCP by January 1, 1963. However, because Hooker wanted to redraft the agreements to take advantage of the favorable U.S. capital gains tax, additional time was needed, and the agreements were not entered into until July 1, 1963 (the "1963 agreements").

Each of the three 1963 agreements involved a transfer by Hooker of all its right, title, and interest in its patent rights and know-how concerning the chemical treatment of metal surfaces for bonding and rustproofing, and each was to last from July 1, 1963 through June 30, 1973, with provision for automatic 5-year extensions if mutually desired. In one agreement, Hooker made the transfer to MG for MG's exclusive use in the Netherlands, Turkey, and Yugoslavia. In a second agreement, Hooker made the same transfer to SCP for SCP's exclusive use in France, Belgium, Luxembourg, Spain, Portugal and the overseas territories which were included within the French Union in 1952. In the third agreement, Hooker transferred the same patent rights and know-how to MG and SCP, jointly, for their exclusive use in Italy, Switzerland, Sweden, Norway, Denmark, and Finland. MG and SCP received the right, under the agreements to sue infringers or unauthorized users of the patents and know-how in their respective geographic territories.

The patent rights transferred were to include all the patents, patent applications, and claims or rights to inventions which concerned the particular chemical treatment, that were owned or thereafter acquired by Hooker during the term of the agreement, and that were held by plaintiff for at least 7 months. The know-how transferred was to include the secret processes, formulae, drawings, operating manuals, and other technical information which related to the chemical treatment, that were owned or subsequently developed by Hooker during the period of the agreement, and that were held by Hooker for at least 7 months. The parties by stipulation agreed that the patent rights and know-how were property used by plaintiff in its trade or business and were not held primarily for sale to customers in the ordinary course of its trade or business. Upon termination of the agreements, the patent rights and know-how transferred were to remain the property of the transferee.

The parties mutually agreed to keep in confidence all of the know-how transferred. Hooker agreed not to communicate knowingly the know-how to any person, firm or company other than the transferee, its assignees, and its licensees, for use within the particular geographic territory. MG and SCP agreed to keep the know-how received confidential, except to the extent that it was public knowledge, or except to the extent that it was necessary to disclose it for the effective use, sale, or licensing of the products or processes to which the know-how pertained. Both obligations survived the termination of the agreements.

The transferee had the option under the agreements either to have the patents covering the inventions in the particular geographic territory issued in Hooker's name, or to have them issued in the name of the transferee. Hooker agreed to cooperate with the transferee in any such efforts, but it was the transferee's obligation to bear all related expenses.

The parties agreed that should a law or requirement of any government hamper the

performance of the agreement in any way, the performance would be excused to that extent, although the party whose performance was affected agreed to use its best efforts to avoid any such cause of nonperformance. It was also agreed that neither party had the right to transfer or assign, to any extent, its ultimate rights and obligations under the agreement, except to its successors in business, without the prior written consent of the other.

Sometime after the basic terms of the 1963 agreements had been agreed to, but prior to signing, Hooker sought to reserve to itself the right to sell to customers in the transferee's geographic territory, and to allow them to use, products relating to the chemical treatment which were manufactured by Hooker in the United States (the "right to import"). Hooker would then also necessarily have the right to divulge to its customers such information needed for the effective use of the product, regardless of whether the information was covered by the agreement (patents or know-how). The reason that Hooker sought the provision was to avoid any possible implication that the transfers of patent rights and know-how constituted a territorial division in violation of U.S. antitrust laws. MG and SCP were at first reluctant to include the provision, but agreed to it so long as Hooker granted to them the reciprocal rights. None of the payment provisions in the agreements were changed, nor was plaintiff obligated to make any payments to MG or SCP on sales made pursuant to the exercise of the right to import. Hooker's right to import survived the termination of the 1963 agreements, although the transferee's obligation not to bring an action against plaintiff, if Hooker exercised that right, terminated with the agreements.

There was no agreement that the right to import would not be exercised but, as a practical matter, its exercise would not have been commercially feasible. Approximately 80 percent of the products that would have been manufactured in the United States and then shipped to Europe contained about 70 percent water. Thus, the low value per pound of weight would have made shipping costs relatively expensive. This, together with the duties to be added to the cost would have made the importation commercially infeasible.

Furthermore, whereas the manufacture of the products was relatively simple, problems sometimes arose in the application of the products to the metal, which would take place in the customers' plants. Thus, the products exported to Europe required on-site technical customer service personnel, with laboratory assistance available, at the customers' locale, and plaintiff was not in a position to render such service in 1963. In contrast, both MG and SCP had their own customer service departments and technical staffs.

For these reasons, plaintiff did not have a substantial export business for the products involved in this case. Instead, Hooker chose to develop foreign markets by means of sale or licensing arrangements with foreign companies.

Occasionally, MG or SCP would request that Hooker export its United States-manufactured product into the geographic territories covered by the 1963 agreements, but Hooker never made any royalty payments to either MG or SCP pursuant to such export sales. The total export sales worldwide in these products by plaintiff amounted to only a small portion of its total sales. Hooker did attempt to export or otherwise move directly into foreign markets for some of its other products manufactured, but not those Parker products that are the subject of this case.

In 1967, the 1963 agreements were modified and the right to import provision was withdrawn from them. An adjunct agreement was executed in which MG and SCP gave a nonexclusive license to Hooker for the right to import, and Hooker agreed to pay a royalty to MG and SCP for any export sales in their respective geographic territories. The 1967 modification was made in order to avoid future tax disputes with the Internal Revenue Service relating to the reservation of the right to import in the original agreements.

Hooker also agreed in the 1963 agreements to provide to MG or SCP any further assistance and information regarding the patent rights and know-how transferred which MG or SCP might reasonably request. Hooker, thus, committed itself to fully explain all of the products and technology transferred under the agreements. About two or three times per month, MG or SCP would make such requests, and plaintiff responded usually by letter or, on occasion, by having its technical personnel, who were already in Europe on other business, help to resolve the problem. The types of problems encountered included getting the transferee's patent applications through their patent office, determining the proper manufacture of the products and use of the technology, and resolving individual questions of the transferee's customers. MG and SCP were capable of handling about 98–99 percent of the problems without plaintiff's assistance.

In addition, Hooker voluntarily sent the information of this type to MG and SCP, even without their request, as plaintiff realized that it was mutually beneficial to forward information which might favorably influence the salability of the product. Plaintiff never made any attempt to hold the technical assistance and information for at least 7 months before transferring it to the transferees.

In consideration of the transfers, MG and SCP agreed to pay Hooker a percentage of the net selling price of all the products offered for sale by them which were sold in or used within the particular geographic territories, and a percentage of all royalties received from their licensees. The amounts payable were solely in consideration of the transfers of patents and know-how. Under those provisions, Hooker received $60,042.62 in its fiscal year ending November 30, 1963,

from MG, SCP, or MG and SCP, jointly. Plaintiff treated the full amount received as long-term capital gain from the sale of a capital asset held for more than 6 months. The Commissioner of Internal Revenue found, *inter alia,* that the payments should be taxed as ordinary income to the plaintiff, and therefore determined a deficiency in Hooker's federal income taxes for that fiscal year. Plaintiff paid the deficiency and timely filed a claim for refund for the alleged overpayment. Upon the Commissioner's disallowance on May 27, 1969, of plaintiff's claim, this action was filed.

### Discussion

The Internal Revenue Code provides favorable tax treatment for long-term capital gains. Internal Revenue Code of 1954 (I.R.C.) §§ 1201, 1202. Long-term capital gain is defined as gain from the sale or exchange of a capital asset held for more than 6 months. I.R.C. § 1222(3). Thus, in order to obtain the preferential treatment for the income it realized under the 1963 agreements, plaintiff must show that the transfer of patent rights and know-how to MG and SCP constituted a sale of a capital asset held for more than 6 months.[1]

The Government concedes that the property transferred was held by the plaintiff for the necessary 6 months. The Government's principal argument is that the transfers of the property under the agreements were not sufficiently complete to constitute sales. In addition, the Government contends that the patents and know-how were property held by plaintiff primarily for sale to customers in the ordinary course of its trade or business and, hence, were not capital assets. Finally, the Government submits, in the alternative, that at least some portion of the payments received by the plaintiff was compensation for subsequent

1. I.R.C. § 1235 provides that a transfer of all substantial rights to a patent deserves capital gains treatment. However, the corporate-plaintiff in this case does not qualify as a "holder," as defined in section 1235(b), and, therefore, the section has no applicability to this case. Treas.Reg. § 1.1235–1(b) (1958). *See Busse v. United States,* 543 F.2d 1321, 1325,

211 Ct.Cl. 247, 255 (1976); *E.I. du Pont de Nemours and Co. v. United States,* 432 F.2d 1052, 1054 (3d Cir. 1970). Nevertheless, the plaintiff could still qualify for capital gains treatment if it can bring its transactions involved in this case within the provisions of I.R.C. § 1222(3).

services provided in the form of technical assistance and information, and, to that extent, the payments were taxable as ordinary income.

## I. Sale

The principal question is whether the transfers executed in the 1963 agreements between plaintiff and MG and SCP constituted sales of the patent rights and know-how or mere licenses. Whether a transfer constitutes a sale or license is determined by the substance of the transaction and a transfer will suffice as a sale if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all his substantial rights to the invention. *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 1077 (1967). The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then give effect to that intention, so long as it is consistent with legal principles. *Pickren v. United States,* 378 F.2d 595, 599 (5th Cir. 1967). The language of the agreements in their entirety must be considered as well as the total factual setting; however, the labels employed and the form used are not determinative. *Kronner v. United States,* 110 F.Supp. 730, 734, 126 Ct.Cl. 156, 163 (1953); *Taylor-Winfield Corp. v. Commissioner,* 57 T.C. 205, 215 (1971), aff'd, 467 F.2d 483 (6th Cir. 1972); *Pickren, supra,* 378 F.2d at 600. Moreover, clauses in an agreement permitting termination by the grantor upon the occurrence of stated events or conditions will not preclude the transaction from being considered a sale; such clauses are uniformly treated as conditions subsequent, akin to provisions in realty conveyances calling for reversion of title previously vested. *Bell, supra,* 381 F.2d at 1011, 180 Ct.Cl. at 1078. With the above in mind, we now discuss the transfers of first, the patents, and then, the know-how.

### A. Patent Rights

A patent confers upon the owner the right to exclude others from making, using,

and selling the thing patented for the life of the patent. In order that a transfer of a patent constitute a sale, the test is whether the transferor has parted with all substantial rights of value in the patent. *See Bell, supra,* 381 F.2d at 1011, 180 Ct.Cl. at 1077. This is a factual determination. A reservation by the transferor of a right of no practical value will not defeat the sale status of the transaction. *Bell, supra,* 381 F.2d at 1021, 180 Ct.Cl. at 1094; *See also E.I. du Pont de Nemours and Co. v. United States,* 432 F.2d 1052, 1055 (3d Cir. 1970), *Young v. Commissioner,* 269 F.2d 89, 93 (2d Cir. 1959).

The substance of the 1963 agreements indicates that a sale, and not a license, was intended by the parties. The transferees were assigned all rights in and to the patents and know-how for the particular geographic territory. Although the 1963 agreements were 10-year agreements, the termination of the agreements by either party did not affect the complete transfer of the patents—the transferee retained all rights, title and interests in the patents for the remaining life of the patents that were transferred over the course of the agreements.

One of the basic legal distinctions between a sale and a license of a patent is whether the transferee has the right to sue infringers of the patent. R. Ellis, Patent Assignments and Licenses § 57 (2d ed., 1943); *E.I. Du Pont de Nemours and Co. v. United States,* 288 F.2d 904, 911, 153 Ct.Cl. 274, 286 (1961). Here, MG and SCP were explicitly granted that right in the agreements. Moreover, the agreements implicitly indicate that the transferees had the right to assign and license the patents transferred to others, another indication of a sale. *Cf. Taylor-Winfield, supra,* 57 T.C. at 219.

The Government contends that plaintiff's reserved right to import its products into the geographic territories covered by the 1963 agreements was a substantial interest in the patent rights and defeats the sale status of the transaction. The Government apparently concedes that the right was exercised by Hooker in, at most, a *de*

*minimis* manner, and only at the request of the transferees, but notes that the mere lack of use of a right does not diminish its potential value. *See Milberg v. Commissioner,* 52 T.C. 315, 319 (1969). Although the Government is correct in its legal proposition, it has missed the point factually.

The facts indicate that the right to import was of no practical value to Hooker. The right permitted Hooker to manufacture the chemical products in the United States and to sell them in the geographic territories in Europe reserved exclusively for MG and SCP. Because most of the products were predominantly water-based, their shipping costs were relatively expensive. There was also a duty cost which had to be considered. Thus, while Hooker had the theoretical right to compete with MG and SCP in parts of Europe, in practice the right was of no significance. It was not commercially feasible for Hooker to compete with its transferees in Europe.

In addition, the sale of the products required the presence of technical service personnel and laboratory capability at the customer's location. In 1963, MG and SCP could provide such assistance in Europe, whereas Hooker could not. This factor also indicates that the existence of the right to import was of no practical consequence.

Defendant points out, however, that plaintiff bargained with its transferees for the reservation of the right, and that such bargaining is inconsistent with plaintiff's present position that it was not a substantial right of value. *See Young, supra,* 269 F.2d at 93. If it were true that plaintiff's negotiations with MG and SCP, and the subsequent granting of reciprocal rights to them, were because plaintiff envisioned that the exercise of the right to import would have some present or potential value, then this argument might be persuasive. But the record indicates that plaintiff desired to include the right in order to eliminate possible antitrust problems caused by the 1963 agreements. In a similar case, the same motivation for the inclusion of a right to import reservation did not make the right of sufficient value to defeat the sale

status of the transaction. *See du Pont, supra,* at 432 F.2d at 1056.

The plain language of the 1963 agreements, as well as the surrounding factual circumstances make clear that the parties intended a sale transaction as opposed to a license. The transferees received the exclusive rights to the patents in their respective territories for the remaining life of the patents, notwithstanding any earlier termination of the 1963 agreements. These exclusive rights included the critical rights to sue infringers and unauthorized users and the right to license, sublicense, assign and otherwise fully use the patent. Further, as indicated in the discussion above, the plaintiff's right to import into the territories covered by the 1963 agreements those products it manufactured in the United States using the same patents and know-how transferred to MG and SCP, was a reservation that had no practical or substantial value to the plaintiff. It is therefore concluded that there was a sale of the patent rights and the reservation of the right to import did not change the nature of that transaction.

B. Know-how

The transfer of know-how is sufficiently akin to patents to warrant the application by analogy, of the tax law that has been developed relating to the transfer of patent rights. *Du Pont, supra,* 288 F.2d at 912, 153 Ct.Cl. at 288–89; Pickren, supra, 378 F.2d at 599; *Taylor-Winfield, supra,* 57 T.C. at 213. This proposition is especially pertinent when patents and know-how have been transferred in the same agreement(s) and closely interrelate as a bundle of rights. *See Bell, supra,* 381 F.2d at 1020, 180 Ct.Cl. at 1093.

Since the 1963 agreements and the surrounding circumstances evidence an intent on the part of the parties to the agreements to execute a complete transfer of the know-how involved (in addition to the patent rights), it is necessary again to determine factually whether plaintiff reserved any substantial rights of value in the know-how to defeat the sale characterization. Al-

though it is useful to discuss the know-how arguments separately from the patent arguments, it should be kept clearly in mind that the transaction involved the assignment of patents and the surrounding know-how which made the patents useful. And, although the parties to the litigation stipulated that a large portion of the know-how could be utilized without reference to any transferred patent, it is hard to contemplate this transaction occurring at all without the transfer of the entire bundle of rights (patents and know-how) at one time.

■ The Government correctly points out that the key consideration in determining whether the transfer of know-how resulted in a sale is whether the recipient acquires the full control over its use and disclosure. *Du Pont, supra,* 288 F.2d at 912, 153 Ct.Cl. at 288–89. In any complete transfer of know-how, there is an implied agreement that the transferor will refrain from using the secret or disclosing it to others. R. Ellis, Patent Assignments and Licenses, *supra,* § 40. This case is complicated, however, by the fact that the agreements here were territorially delineated. Thus, Hooker clearly retained the right to use and disclose the know-how for sales in territories not included in the 1963 agreements, just as it retained its U.S. patent rights for the manufacture, use, and sale of the chemical products in the United States.[2] What must be examined, then, is whether Hooker retained the right to use and disclose the know-how for use in the exclusive MG and SCP territories during, as well as after, the termination of the agreements. The Government contends that it did, and that such retention constituted a substantial right in the property thus defeating the "sale" of the know-how to the transferees. The Government proposes a number of contract provisions and contentions which indicate that plaintiff intended to retain such right: (1) the right to import reservation; (2) the right to use the know-how upon termination of the agreements; (3) the requirements that the

transferees keep the know-how secret; (4) the antiassignment provision which required the parties' consent before assignment; and (5) the *force majeure* provision in the contract.

The Government first argues that Hooker reserved the right to import the chemical products into the MG and SCP territories and therefore retained the right to use the know-how for sales in those territories. In addition, it maintains that the right to import continued even after termination of the agreement. The Government contends that the right to import was a substantial right of value and hence concludes there was no "sale" of the know-how in the complete transfer sense.

This argument pertaining to the patent rights has already been discussed and decided against the Government. The same reasoning and conclusions follow with regard to the know-how. The right to import the know-how simply was not a reservation of a substantial right and will not defeat the parties' sale intentions, during the term of the agreements or after.

■ The second argument is that plaintiff had the right to terminate the agreements after the original 10-year term. Upon termination, the Government asserts that there were no restrictions upon the plaintiff's subsequent use or disclosure of the know-how within the territories involved in this case because the transferees were not specifically given the right to prevent the unauthorized disclosures of the know-how after the termination. Consequently, the Government concludes that a substantial right in the know-how was retained by Hooker.

In *Taylor-Winfield, supra,* 57 T.C. at 215–17, the taxpayer transferred certain patent rights and know-how to a Japanese corporation. Plaintiff retained the right to terminate the agreement at will at the end of a 10-year period, and it was provided that

---

2. The U.S. patents, of course, afforded no rights to the transferees to make, use and sell the chemical products in their foreign countries. Rather, Hooker transferred the foreign patents of those countries to MG and SCP, or, the right of the inventor to apply for those foreign patents. *See* 35 U.S.C. §§ 102(f), 118 (1970); finding of fact 23.

upon termination, the patents would revert back to the taxpayer. Although there was no specific provision for the reversion of the know-how upon termination, the court inferred that it was omitted merely because it would not have been possible for the transferee to eradicate that knowledge anyway. *Taylor-Winfield, supra,* 57 T.C. at 217. The court concluded that the right to terminate at will and the reversion back provision were substantial retained rights, inconsistent with an absolute transfer, and therefore found that the transfer was a mere license. *See also PPG Industries, Inc. v. Commissioner,* 55 T.C. 928 (1970); *Cubic Corp. v. United States,* 72–1 USTC ¶ 9165 (SD Cal. 1971), *aff'd* 541 F.2d 829 (unpubl.), (9th Cir., 1974), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

Similarly, in *Bell, supra,* 180 Ct.Cl. at 1092–96, 381 F.2d at 1019–22, the taxpayer entered into an agreement whereby it granted to an Italian company the exclusive right to manufacture, assemble, and sell the Bell Model 47–J helicopter in Italy. Bell agreed to transfer all of its necessary patent rights and know-how in connection with that grant. The agreement was for the full remaining term of the latest patent transferred, but either party could terminate it at any time after 10 years, with or without cause, upon 60 days' notice. The court concluded that because the transfer was terminable at will by the taxpayer prior to the remaining life of the last patent, a license rather than a sale of the property had been effected, and that the taxpayer "could sell the data and information to someone else after the 10-year period ended." *Bell, supra,* 381 F.2d at 1021, 180 Ct.Cl. at 1095.

In the present case, plaintiff also had the right to terminate the 1963 agreements after the initial 10-year term. However, unlike the situation in *Taylor-Winfield,* there was no provision upon termination for reversion of the patents or the know-how property to Hooker. Furthermore, whereas in *Bell,* there was no express language in the agreement indicating that a transfer of the property in perpetuity had been intended by the parties, the Hooker agreements specifically provided that "[a]ll rights in

and to [the patents and know-how transferred] *shall remain the property of [the transferee]."* [Emphasis added.] They also provided that "[t]he assignments to be made * * * shall include all of Hooker's right, title and interest in and to [the patents and know-how transferred] in the * * * [t]erritory including, without limitation, the right to sue infringers or unauthorized users thereof in such [t]erritory." Finally, the agreements stated that "[a]ll [of the know-how] assigned hereunder shall be for the use of [the transferee], its * * * assignees and licensees in the [particular geographic territory], and shall not be communicated by Hooker to any other person, firm or company knowingly for use within the [particular geographic territory]" and it was intended by the parties that that provision survive the termination of the agreements. Thus, unlike *Taylor-Winfield, supra* 57 T.C. at 217 and unlike *Bell, supra,* 381 F.2d at 1019–22, 180 Ct.Cl. at 1092–96, Hooker could not disclose any of the know-how even after the termination of the agreements without risk of an injunctive or breach of contract suit. The strong and clear language of the agreements indicate that Hooker had no further property rights in the patents and know-how transferred. The termination provision then, merely concluded plaintiff's continuing duty under the agreements to transfer subsequently developed patents and know-how, and plaintiff's continuing right to receive royalty payments. Termination of the agreements did not allow plaintiff to sell the same know-how already sold to MG and/or SCP again in the same territory.

It is important to note in this connection that the Government does not contend that plaintiff failed to give up all its rights in the patents because of the 10-year termination provision. The Government's challenge on this point is limited to the know-how transfer. Clearly, the plaintiff gave up all rights with regard to the patents after termination (the most critical right, of course, was the right of the transferee to sue infringers in the territory for the life of the patents). But the Government contends

that the same language which effected a complete transfer of the patent rights was deficient with regard to the know-how transfer. One simply cannot credit this argument. The bundle of rights transferred in this transaction consisted of patent rights and know-how, with the know-how being an incident of the patents. *See Bell, supra*, 180 Ct.Cl. at 1093, 381 F.2d at 1020. Just as the court in *Taylor-Winfield, supra*, 57 T.C. at 217, found that a reversion of the patent rights to the transferor necessarily implied a reversion of the attendant know-how, an absolute transfer of the patent rights in the present case logically and necessarily indicates that an absolute transfer of the know-how was also effected. The strong and clear language of the agreements and the intent of the parties reflect as much.

■ Thirdly, the Government contends that the agreements required MG and SCP to keep the know-how secret within their exclusive geographic territories. That requirement, the Government asserts, indicates that Hooker intended to preserve its property rights in the trade secrets for possible future use in the territories covered by the agreements, an intent inconsistent with a sale. *Taylor-Winfield, supra*, 57 T.C. at 218; *Commercial Solvents Corp. v. Commissioner*, 42 T.C. 455, 468–69 (1964).

The specific provision in the agreements states:

[The transferee] agrees to hold in confidence and safeguard the secrecy of all of the know-how received by it under this Agreement so long as such Know-how is not generally known to the public, *provided, however, that it may disclose such Know-how to the extent necessary in connection with the manufacture, use, sale or licensing* of the [chemicals or chemical techniques] to which it pertains. [Emphasis supplied.]

The transferees had an obligation of confidentiality but could disclose the know-how, where necessary, in the manufacture, use, sale, and licensing of it. The obligation therefore did not circumscribe the transferee's total use of the know-how.

What it did do is recognize an obvious fact that once a secret is out of the bag, it becomes much less valuable. That value remained important for the transferees in the MG/SCP territories and for the plaintiff in North America and elsewhere worldwide. As such, it represents a reasonable method used to prevent the unauthorized disclosure of the know-how beyond the MG/SCP territories and was therefore not a substantial right of value retained in the transferred know-how.

■ Fourth and closely related to this point, the Government contends that another general provision of the agreements preclude the transferees from licensing or sublicensing the patents and know-how without the prior consent of the plaintiff. It concludes that this is another indication that something less than the complete know-how package was transferred by the agreements. *See Taylor-Winfield, supra*, 57 T.C. at 218–19.

The specific provision involved reads:

Neither party shall be entitled to transfer or assign, partially or entirely, its rights or obligations under this Agreement, except to its successors in business, without the prior written consent of the other party.

Although there is a certain ambiguity in the language of the agreements on this point, if one reads the agreements in their entirety and focuses on some of the relevant factual circumstances surrounding this point, one must come to the conclusion that consent by the plaintiff before the transferees could license or sublicense was not what was intended by the parties.

To begin with, the language of the provision appears to go to the ultimate point of whether there can be a total or partial substitution of the parties to the 1963 agreements without the other parties' consent. Hooker wanted to make sure that unless it consented otherwise, it would continue to deal with MG and SCP, and not some third party regarding the ultimate rights and obligations under the agreements, especially the right to receive royalties. The provision does not appear to

touch the point of whether the transferees can license or sublicense without consent the products or processes which they have obtained title and use of through the agreements. If this interpretation is correct, *Bell, supra*, 381 F.2d at 1017, 180 Ct.Cl. at 1088, tells us that a similar provision restricting the transferee's right to assign its interests did not negate a sale. Rather, the court stated that it was a reasonable method used to protect the taxpayer's right to royalty payments.

That this interpretation is the correct one is bolstered by the payments provisions contained in the agreements which are replete with language of authority to license and sublicense without prior consent.

In addition, this was the interpretation placed on the provision by Mr. Frank Hendricks, the plaintiff's lead witness and manager of the agreements throughout this period, whose interpretation was not rebutted by the Government.

In view of the above, it is concluded that the provision is a reasonable method to protect plaintiff's right to royalties and in no way restricts the sale status of the agreements.

■ Finally, under the 1963 agreements, it was provided that:

If the performance of this Agreement, or of any obligation hereunder, other than the payment of money due and owing hereunder, is prevented, restricted or interfered with by reason of:

\* \* \* \* \* \*

C. Any law, order, proclamation, regulation, ordinance, demand or requirement of any government \* \* \*

\* \* \* \* \* \*

the party so affected, upon giving prompt notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference; *provided*, that the party so affected shall use its best efforts to avoid or remove such causes of non-performance and shall continue performance hereunder with the utmost dispatch whenever such causes are removed.

The Government asserts that by this provision, Hooker retained the right to transfer the know-how for use within the MG and SCP territory. The Government's reasoning is as follows: Hooker had other transferees who received the same know-how for use within other territories. If the national law of one of those other transferees prohibited any limitation upon the area to which the transferee could export its goods, then such transferee would have the right to market its goods directly into the MG and SCP territory. Although that act would be a violation of Hooker's 1963 agreements with MG and SCP, the above provision would excuse Hooker and be a complete defense to any breach of contract claim.[3]

It is clear that the provision in question is a standard *force majeure* clause. The parties did not envision a scenario such as the one suggested by the Government, nor did they intend that the clause operate in that manner. Moreover, Hooker would have had the duty to use its best efforts to remove the cause of nonperformance even had the Government's contentions occurred. Any rights retained by plaintiff under the *force majeure* clause were merely hypothetical, and not substantial ones of value. Moreover, it was one of those conditions subsequent that *Bell, supra*, 381 F.2d at 1011, 180 Ct.Cl. at 1078, indicates should not defeat the sale status of the transaction.

From the above discussion, it is concluded that a sale of the know-how was intended

**3.** This is also very close to the Government's reasoning in its "the agreements violated the rules of the Common Market" argument. At the base of the Government's argument, however, is an evil motive theory. That is, that the plaintiff really intended to violate the Common Market rules by carving up the territories the way it did, thereby allowing the same patents and know-how to be imported because the agreements themselves were unenforceable within the Common Market countries. Nothing remotely suggesting this is in the record, and, if the Government thought the point was worth exploring, it should have done so at and before trial. It will not be credited now.

by the parties to the 1963 agreements and that the plaintiff did not retain any substantial rights of value in the transfer of the know-how. Consequently, considering the 1963 agreements in their entirety, and all of the underlying circumstances of the transaction, it is concluded that the entire package of patent and know-how rights should be accorded sale transaction status.

## II. Capital Asset

Section 1221 of the Internal Revenue Code defines "capital asset" as meaning all property held by the taxpayer other than certain enumerated exceptions. The critical exception in this case is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." I.R.C. § 1221(1).[4] The Government contends that plaintiff's foreign patent and know-how rights (as opposed to its United States, e. g., domestic patent and know-how rights) were held primarily for sale to customers in the ordinary course of its trade or business, and hence were not capital assets. It concedes, implicitly, that plaintiff's domestic patents and know-how rights were not held primarily for sale and thus were capital assets.

 The problem here is not so much the merits of the contention as the timing of it. The Government first raised the issue in its initial posttrial brief. Throughout the course of this case, which commenced in May 1971, the Government, in one submission after another filed with this court, had conceded that the patents and know-how at issue were capital assets. Its concern was whether or not there had been a complete

sale of the capital assets as opposed to a new license granted. Immediately prior to trial, the parties even stipulated to this point, which stipulation became a part of the record in this case and was available at all times during the trial. The stipulation in pertinent part read:

> \* \* \* [T]he property transferred under all of the 1963 agreements \* \* was property used by the plaintiff in its trade or business and was not held primarily for sale to customers in the ordinary course of its trade or business.

The Government contends that it should now be relieved from the effects of its stipulation because the plaintiff had argued for the first time in its initial posttrial brief that for many years it had followed the practice worldwide of transferring technology by license or sale to local foreign chemical companies. This being the case, the Government asserts that the foreign patent and know-how rights were held for sale in the ordinary course of plaintiff's business in foreign countries.

The Government's argument simply will not be countenanced at this stage for several reasons. One, the plaintiff did not just now change its position—its position appears to this court to have remained the same throughout the 6–7 year course of this case. Two, the Government had ample opportunity (approximately 6 years) to discover what in fact the plaintiff's position was prior to trial and act accordingly. Third, it would be unjust to decide this essentially factual point against the plaintiff, when it was never on notice that it was

---

**4.** I.R.C. § 1221 provides in pertinent part:
"SEC. 1221. Capital Asset Defined.
"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
"(2) property, used in his trade or business, of a character which is subject to the

allowance for depreciation provided in section 167, or real property used in his trade or business;
"(3) a copyright, a literary, musical, or artistic composition, or similar property,
\* \* \* \* \* \*
"(4) accounts or notes receivable \* \* \*
"(5) an obligation of the United States \* \* \*."
I.R.C. § 1231(b)(1)(B) similarly excludes from the definition of "property used in the trade or business" property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

in issue. *See PPG, supra*, 55 T.C. at 1016. Had the Government placed the point in issue, the plaintiff at least would have had the opportunity to present its affirmative evidence. Although this court has relieved a party of a stipulation in order to prevent an injustice, *Zachry v. United States*, 344 F.2d 352, 357, 170 Ct.Cl. 115, 123 (1965), the general rule is that the parties are bound by their stipulations of fact absent special considerations. *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 334, 208 Ct.Cl. 704, 719 (1976); *Gresham & Co. v. United States*, 470 F.2d 542, 551, 200 Ct.Cl. 97, 112–13 (1972). Here, largely because of the parties' reliance upon the stipulation, no evidence was presented into the record on this factual determination, and no special circumstance is found to justify disregarding the stipulation. It is concluded, therefore, that the patent rights and know-how were not held by Hooker primarily for sale to its customers in the ordinary course of its trade or business, and that they were capital assets.

### III. Technical Services

Plaintiff agreed in the 1963 agreements to furnish its transferee with such information with regard to the patents, patent applications, inventions, and know-how transferred as the transferee might reasonably request.

The specific provision in pertinent part reads:

Hooker agrees to furnish [MG and/or SCP] with such information with respect to the patents, patent applications, inventions and Know-how assigned * * * as [MG and/or SCP] may reasonably request.

The Government argues that even if the transfer of the patent rights and know-how did constitute a sale of a capital asset, some portion of the payments received by Hooker was in consideration for the technical assistance and information (services) subsequently rendered to the transferees, and, consequently, that "some" portion is taxable as ordinary income to Hooker.

The Government raised a similar argument in *PPG, supra*, with regard to certain materials transferred along with patents and technical know-how. The court stated:

* * * We believe the materials in question merely implemented the transfer of the patented and unpatented * * technology * * * and made possible the effective utilization of such technology. Consequently, such materials were ancillary and subsidiary to the technology transferred and we see no justification for attributing to them any portion of the consideration.

*PPG, supra*, 55 T.C. at 1018; *see also United States Mineral Products Co. v. Commissioner*, 52 T.C. 177, 199 (1969); *Ruge v. Commissioner*, 26 T.C. 138, 143 (1956).

In the present case, the agreements specified that the royalty payments were solely in consideration of the transfers of patents and know-how.

Secondly, this case involved the transfer of relatively sophisticated technology. It is not at all unusual under these circumstances to have an "assistance" clause contained in an agreement to make the technology useful in the event problems would arise. The facts, as they unfolded in this case indicated quite clearly that this is precisely what happened. The vast majority of the inquires from the transferees were of the type that could be labeled "starting up" or "fully explaining the patents and know-how" inquiries, and were not of the "continuing technical assistance after start up" variety. *See* Rev.Rul. 64–56, 1964–1 C.B. 133; Rev.Rul. 71–564, 1971–2 C.B. 179 (involving a similar question under I.R.C. § 351).

Thirdly, the amount of technical services provided by the plaintiff in any event was *de minimis*. *See du Pont, supra*, 432 F.2d at 1057.

In view of the above, it is concluded that the information that was furnished by the plaintiff was ancillary and subsidiary to the transfer of the intangible property. Plaintiff made a sufficient prima facie showing to this effect which was not sufficiently rebutted by the Government. As such, it is

determined that no part of the consideration received by plaintiff will be accorded ordinary income tax treatment.

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiff may treat the proceeds received from the transfers as long-term capital gain. Therefore, the plaintiff is entitled to recover the difference between ordinary income tax treatment accorded it on receipts of $60,042.62 in its 1963 fiscal year and the amount that would be due if capital gains tax treatment had been accorded it, together with interest as provided by law, and judgment is entered to that effect. The full amount of recovery will be determined in further proceedings pursuant to Rule 131(c).

Plaintiff's remaining claims for FY 1962 and 1963, according to the parties' stipulation, are hereby dismissed with prejudice.