GLEN O'BRIEN MOVABLE PARTITION COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5508–75.    Filed June 28, 1978.

*Bernard D. Craig* and *Edward P. Moran,* for the petitioner.
*Joe K. Gordon,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioner's Federal income tax for its fiscal year ended July 31, 1971, in the amount of $4,115.44. Concessions having been made, the only issue remaining for our decision is whether a $25,000 payment made to petitioner by a foreign corporation was paid for the transfer of petitioner's Japanese patent rights and other property and, if so, whether such transfer constituted a sale so that such amount, less sales expenses, should be treated as capital gains.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Glen O'Brien Movable Partition Co., Inc. (petitioner), is a corporation formed and existing under the laws of the State of Missouri. Petitioner's principal place of business was in Kansas City, Mo., at the time the petition was filed herein. Petitioner's United States corporation income tax return for the taxable year ended July 31, 1971, was filed with the Internal Revenue Service Center at Kansas City, Mo.

Petitioner is and has been engaged in the business of manufacturing and selling partition systems for subdividing space into smaller usable spaces. Petitioner has in the past applied for and secured patents for components of its partition systems.

During 1969 and 1970, petitioner entered into negotiations with Yawata Econ Steel Co. (Yawata), a corporation organized and existing under the laws of Japan, with a view towards allowing Yawata to manufacture and sell in Japan all of the types of partitions designed by petitioner. Yawata wanted petitioner's Japanese patent rights and its know-how to manufacture and sell the partition systems in Japan. As a result of these negotiations, petitioner entered into a contract with Yawata entitled "Technical Services Agreement" (agreement) which was signed by petitioner's representatives on April 22, 1970, and by Yawata's representatives on April 28, 1970. Such agreement reads in part as follows:

WHEREAS, Yawata proposes to engage in the business of the processing, fabrication, manufacture and sale of aluminum frames for movable partitions and aluminum parts and accessories, the same or similar to those manufactured by O'Brien, consisting of, without being limited to, "Quick Change" ® Partition Systems No. 175 and No. 275 and which are hereinafter referred to as "PRODUCT", and desires the aid and advisory services of O'Brien in various aspects of planning, training, research and the continuing operations of the business as set forth on the following pages, and O'Brien is desirous of supplying such aid and advisory services.

       *       *       *       *       *       *       *

ARTICLE 2. Proposal of Techniques.

(1) *As to O'Brien.*

(A) During the term of this Agreement, O'Brien will furnish to Yawata all such engineering, research data and other data relating to the production of "PRODUCT", making available to Yawata, upon request, information or advice pertaining to:

(a) *Functions of Engineering,* all necessary engineering pertaining to "PRODUCT" including:

(i) Techniques related to designs of aluminum frames, accessories, hardware, filling materials, etc.

(ii) Techniques related to designs for joint portion between panels and frames.

(iii) Techniques related to designs concerning airtightness, sound proof and fire-prevention for partitions.

(iv) Advices related to testing methods and equipment for the above (iii).

(v) Techniques related to installation of partitions.

(vi) Information data to indicate actual status of various regulations, laws and criterion concerning fire-prevention in the United States of America.

(vii) All other techniques and data relating to "PRODUCT".

(b) *Functions of Manufacturing,* including maintenance of production and shipping schedules, maintenance of plants and manufacturing equipment, study of methods for modernization and development of new and improved manufacturing facilities, investigation of new and improved methods of packaging "PRODUCT", engineering matters, development of methods for reduction in the cost of "PRODUCT" to the greatest extent consistent with the maintenance of quality.

(c) *Raw Material,* such services consisting of advising as to the type and quantity of raw materials required.

(B)(a) All information, of whatever nature it may be, which is possessed by O'Brien will be furnished to Yawata.

(b) When O'Brien develops any new technique connected with this Agreement and within the term of this Agreement, including any item that cannot be drawn or placed in written form or further assistance to the development of the same, O'Brien will, upon request, submit it to Yawata without additional charge to those provided herein.

(c) O'Brien shall be obligated during the term of this Agreement, to voluntarily supply Yawata with all new developments, modifications and any

other information pertaining to "PRODUCT" and that may be of aid to Yawata.

(d) O'Brien agrees to permit Yawata to apply for patents in Japan in its own name on all patents now issued to or which may be hereafter issued to O'Brien during the term of this Agreement and Yawata agrees to permit O'Brien to apply for patents in the United States in its own name on all patents issued to it covering all developments on the "PRODUCT".

(2) *As to Yawata.*

(a) Yawata agrees to furnish to O'Brien, without the payment of any license fee, all such engineering, research data and other data as it shall develop during the term of this Agreement relating to the production of "PRODUCT", making same available to O'Brien upon request therefor.

(b) Yawata will hold in confidence and will not disclose to other parties except its own subsidiaries any of the technical advice, development, improvements and engineering research, statistical and other data and information that it has or will have obtained from O'Brien or its employees.

ARTICLE 3. Exclusiveness and Territory.

O'Brien for the duration of this Agreement, hereby grants to Yawata, which accepts, the exclusive right to manufacture and sell "PRODUCT" in Japan without the right to permit others to do so except its own subsidiaries, it being understood that O'Brien shall not reserve the right to manufacture and sell "PRODUCT" in Japan.

Yawata is also granted the non-exclusive right to sell and assemble "PRODUCT" to and in other countries in Southeast Asia and Oceania, including, but not limited to Taiwan, Korea, Hong Kong, Philippines, Australia and New Zealand.

ARTICLE 4. Purchase of Machinery, Equipment and Parts.

O'Brien will advise on the purchase of machinery and equipment needed by Yawata as shall be requested by Yawata from time to time, O'Brien shall not advance its own funds, or use its credit, or guarantee the credit of Yawata, or purchase any items in its own name without revealing to the sellers that the ultimate purchaser is Yawata, except to any extent voluntarily desired to be done by O'Brien.

O'Brien shall:

\* \* \* \* \* \* \*

(f) Provide Yawata, upon request, one set of samples of the existing "PRODUCT" or products to be developed and covered by this Agreement free of charge. This is to include small sales aid demonstrators presently being used by O'Brien concerning the "PRODUCT".

(g) During the term of this Agreement, O'Brien agrees to sell to Yawata component parts manufactured by O'Brien or regularly carried in the inventory of O'Brien for such prices and upon such terms as O'Brien shall establish from time to time to be sold by it for delivery to and use by Yawata for the manufacture and sale of "PRODUCT" in Japan. Yawata shall make all necessary arrangements to obtain import permits for such components and parts to enter Japan and shall pay the duty and import fees thereon, if any.

\* \* \* \* \* \* \*

ARTICLE 5. Exchange of Engineers.

(a) O'Brien will, at the request of Yawata, send one member of its engineering staff at a time to Yawata in Japan to render engineering and technical aid and assistance to Yawata for the manufacture and sale of "PRODUCT" for periods not to exceed two weeks for each such engineering representative on any one trip or more than four weeks for each such engineering representative in any calendar year and Yawata shall pay the travel and reasonable living expenses limited to lodging, meal and transportation of such engineering representatives. The terms and conditions for the payments specified in this paragraph (a) shall be specified under a separate Agreement.

*     *     *     *     *     *     *

(c) O'Brien will furnish advice in the establishment of accounting and production systems. In the event of disagreement between Yawata and such employees as to the proper operation of the business, development of new products or processes or sales of its products the decision of Yawata shall control.

(d) During the period of this Agreement, O'Brien will furnish training in the manufacture and sale of "PRODUCT" at its manufacturing plant in Kansas City, Missouri to such number of Yawata employees and for such period of training time for two employees at a time as may be mutually agreed upon by Yawata and O'Brien from time to time. The types and methods of such training shall be mutually determined by O'Brien and Yawata.

ARTICLE 6. Payment Terms and Technical Service Fees.

As compensation for the services, aid and advice rendered by O'Brien to Yawata pursuant to Articles 1 to 5 inclusive of this Agreement, Yawata will (in addition to the reimbursement of expenses provided in Article 5 hereof) pay technical service fees on the net sale of "PRODUCT" by Yawata computed annually as follows:

(a) Yawata agrees to pay $25,000 as an initial payment for the techniques offered by O'Brien according to this Agreement which shall be paid within sixty (60) days after obtaining the sanction of the Japanese Government to this Agreement.

(b) In addition to the above, Yawata shall pay the following technical service fees:

i. No technical service fees shall be paid for the period of one full year commencing from the effective date of this Agreement. Any sales which may be created by Yawata during this first full year shall not be subject to the calculation for the technical service fees specified in this Agreement.

ii. For the 2nd, 3rd, 4th, 5th and 6th years of this Agreement, Yawata shall pay O'Brien technical service fees on the net sales of "PRODUCT" by Yawata in the territory covered by this Agreement computed annually as follows:

On the first One Hundred Eighty Million Yen (180,000,000.00) .............. 1.75%
On all sales over the above amount ............................................. 1.25%

*     *     *     *     *     *     *

ARTICLE 8. Effectiveness and Term of Agreement.

This Agreement shall become effective from the date when Yawata obtains the Japanese government sanction and shall continue for a period of six (6)

years thereafter; provided, however, that at the termination of this Agreement, it shall be extended for an additional period therefrom in case the parties are mutually agreeable provided that either O'Brien or Yawata gives the other party written notice that it wishes to extend this Agreement. Such written notice, to be effective, must be given not earlier than one year prior to the scheduled termination hereof, and not later than six months prior to the scheduled termination hereof.

ARTICLE 9. Language.

The English language version of this Agreement is the official version for all purposes * * *

\* \* \* \* \* \* \*

ARTICLE 13. Assignment.

Neither O'Brien nor Yawata may assign this Agreement, provided that this requirement shall not be applicable in the case of merger or amalgamation.

The components of petitioner's partition systems which were the subject of the agreement are patented by petitioner in the United States and such partition systems could not be manufactured without the use of petitioner's patented features. Petitioner's patents were issued January 11, 1966, and October 4, 1966.

Pursuant to the terms of the agreement, petitioner received an initial payment on September 21, 1970, in the agreed amount of $25,000, less withheld Japanese income tax of $2,500. Such $2,500 was claimed and allowed as a credit toward petitioner's United States corporate income tax liability.

On September 23, 1970, a $5,000 fee was paid to SSS, Ltd., for its services in securing and helping to negotiate the agreement. Such $5,000 fee was claimed and allowed as an "expense of sale" in petitioner's corporate income tax return for its taxable year ended July 31, 1971. Petitioner reported the remaining $20,000 of the $25,000 initial payment as long-term capital gains from the sale of a patent. In his statutory notice, respondent determined that such $20,000 was ordinary income.

Pursuant to the terms of the agreement, a group of representatives from Yawata (Japanese team) came to Kansas City in September 1970, and remained for approximately 3 weeks. Petitioner furnished the Japanese team sample parts, dye drawings, installation manuals, installation technique and know-how, layouts, and the specifications, designs, and materials for actual mock-ups. The Japanese team took color slides of petitioner's plant, motion pictures of installations, and tape recordings of all their conversations with petitioner's representatives. The Japanese team visited all of petitioner's major

suppliers to take pictures and know-how from their plants where petitioner had tooling. The Japanese team also visited jobsites, helped do an installation, and talked with petitioner's foremen on the jobsites.

The Japanese team paid their own expenses during their September 1970 visit. After such visit, no other representatives of Yawata came to Kansas City, under the agreement.

David LaGue, as a representative of petitioner, made a trip to Japan in 1971. While in Japan, LaGue inspected Yawata's manufactured partition systems and helped with its first major installation.

Yawata paid the expenses of LaGue's visit to Japan. No other representatives of petitioner visited Japan pursuant to the agreement.

Between June 1972, and November 1976, petitioner received a total of $6,583.68 as "technical service fees" on Yawata's net sales of partition systems. The agreement expired at the end of its stated 6-year term in 1976.

The agreement entered into between petitioner and Yawata was the first such arrangement petitioner had made since its founding in 1954. Since the agreement with Yawata, petitioner has entered into a similar agreement with a Venezuelan company.

OPINION

Respondent contends that petitioner is not entitled to treat the $25,000 payment in question, less sales expenses, as capital gains because at least part of such payment was made in return for advisory services rendered to Yawata by petitioner and if any part of such payment did represent consideration for patent rights it is nevertheless taxable as ordinary income because the agreement represented a license rather than a sale. Petitioner contends that the $25,000 payment was made solely in consideration for its transfer to Yawata of its Japanese partition systems patent rights and know-how and, furthermore, that such transfer was a sale because petitioner retained no substantial rights in such Japanese patents or know-how.

The first issue facing us is a determination of what rights Yawata received in return for the $25,000 payment and whether

the transferred rights are property for purposes of sections 1221 and 1231.[1]

Under articles 2 through 5 of the agreement, Yawata received (1) petitioner's current Japanese patent rights and the right to use its current know-how in Japan, (2) the right to advisory services, and (3) the Japanese rights in future patents and know-how with respect to petitioner's future developments in partition systems. In return, Yawata agreed in article 6 to pay petitioner an initial payment of $25,000 and additional payments for the second through sixth years of the agreement equal to a specified percentage of Yawata's sale of the partition systems in areas covered by the agreement.

In particular, article 6 states:

ARTICLE 6. *Payment Terms and* Technical Service Fees.

As compensation for the services, aid and advice rendered by O'Brien to Yawata pursuant to Articles 1 to 5 inclusive of this Agreement, Yawata will (in addition to the reimbursement of expenses provided in Article 5 hereof) *pay technical service fees on the net sale of "PRODUCT" by Yawata computed annually* as follows:

(a) Yawata agrees to pay $25,000 as *an initial payment for the techniques offered by O'Brien* according to this Agreement which shall be paid within sixty (60) days after *obtaining the sanction of the Japanese Government* to this Agreement.

(b) *In addition to the above,* Yawata shall *pay the following technical service fees:*

[Emphasis supplied.]

Although the term "techniques" is not defined anywhere in the agreement, article 2 is entitled "Proposal of Techniques" and provides, in part, that petitioner will furnish Yawata with present and future techniques relating to the design of various patented and unpatented aspects of the partition systems and to their manufacture and installation. Article 2 also contains a provision granting Yawata the right to apply for Japanese patents in its own name on all patents currently issued to petitioner as well as all patents issued to petitioner during the term of the agreement. Accordingly, we find that Yawata made the $25,000 payment as an initial and part payment[2] in return

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

[2] Although the tax treatment of these payments is not in issue herein, we also find that at least part of the percentage payments under article 6 is attributable to petitioner's present and future Japanese patent rights, know-how, and ancillary services. The remainder is attributable to the technical services to be provided under articles 3–5. The agreement labels the $25,000 payment as an "initial" payment thereby implying that it is not a full payment for the techniques. In addition, the amount of

for petitioner's present and future Japanese patent rights and know-how and those services *only* which were required to transfer such patent rights and know-how to Yawata.

In order to be entitled to capital gains treatment, petitioner must prove that its transfer constituted the sale of property pursuant to either section 1221 or section 1231.[3] If the grantor retains no substantial rights in the subject matter of a transfer, then such transfer is a sale rather than a license. *Waterman v. MacKenzie*, 138 U.S. 252 (1891); *Bell Intercontinental Corp. v. United States*, 381 F.2d 1004 (Ct. Cl. 1967); *PPG Industries, Inc. v. Commissioner*, 55 T.C. 928 (1970). Where the meaning of the agreement is not plain and its terms are ambiguous, we must examine the agreement, its purposes, and the surrounding circumstances in order to determine if a sale was mutually intended. *Pickren v. United States*, 378 F.2d 595 (5th Cir. 1967); *Bell Intercontinental Corp. v. United States, supra* at 1011. Upon such examination, we conclude that the transfer of petitioner's Japanese patent rights to Yawata constituted a sale of those rights.

Article 2 of the agreement clearly gave Yawata the right to apply for Japanese patents *in its own name* parallel to petitioner's American patents and we do not believe the article 8 termination clause can be reasonably interpreted as a limitation upon Yawata's rights under Japanese patents issued under its name.

The sale of a foreign patent, like the sale of an American patent, constitutes the sale of "property" for purposes of sections 1221 and 1231. *Bell Intercontinental Corp. v. United States, supra; PPG Industries, Inc. v. Commissioner, supra; United States Mineral Products Co. v. Commissioner*, 52 T.C. 177 (1969). It is unnecessary for this foreign patent, or an application therefor, to be in existence at the time of the sale because the inventor's property right in an invention arises at the time the invention is conceived. *United States Mineral Products Co. v. Commissioner, supra* at 196–197; *Estate of Laurent v. Commissioner*, 34 T.C. 385, 399 (1960).

---

the percentage payments is contingent on the net sales which Yawata makes by use of the patent rights and know-how transferred to it under the agreement and will be determined primarily by the profitability of petitioner's present and future patent rights and know-how.

[3]Sec. 1235 does not apply because petitioner, a corporation, does not qualify as a "holder" under sec. 1235(b) so that the transaction involved in this case is not one described in sec. 1235(a).

Respondent argues that petitioner has failed to prove that Yawata ever applied for a Japanese patent and that since the exclusive right to apply for one terminated with the agreement, there was no sale of a patent. We disagree. Petitioner's witnesses forthrightly testified that they did not know if Yawata had applied for Japanese patents, but that they presumed it had done so. Such presumption is soundly supported by the record. We have found that Yawata entered into the agreement with petitioner in order to obtain *both* petitioner's patent rights and its know-how to enter the partition systems business and that Yawata actually began manufacturing petitioner's partition systems in Japan in 1971. We do not believe that Yawata would have undertaken the substantial expense to begin manufacturing the partition systems unless its exclusive right to do so in Japan was protected by patent.

In any event, Yawata negotiated for and had the exclusive right to apply for Japanese patents during the period of the agreement and petitioner retained no rights during the terms of the agreement limiting in any way Yawata's right to apply for Japanese patents. It was likely that Yawata would apply for such patents since it had bargained for the right to apply for them and it was expending a substantial sum to begin manufacturing the partition systems. Under these circumstances, we do not believe that the possible reversion to petitioner of the right to apply for Japanese patents upon termination of the agreement was a substantial right retained by petitioner.

Respondent also argues that there was no sale of petitioner's patent rights because Yawata could not assign its rights under the agreement except upon merger or amalgamation. The right to assign patent rights is not requisite to the sale of patent rights. *Bell Intercontinental Corp. v. United States, supra* at 1017; *Rollman v. Commissioner*, 244 F.2d 634, 640 (4th Cir. 1957); *Dreymann v. Commissioner*, 11 T.C. 153, 161 (1948). Moreover, the fact that the payment for petitioner's Japanese patent rights was made by an initial payment together with percentage payments made over a period of time in amounts based upon Yawata's use of the invention is immaterial to our determination that petitioner sold its Japanese patent rights. *United States Mineral Products Co. v. Commissioner, supra* at 194. We hold that petitioner did not retain any substantial rights in the Japanese patent rights so that it sold such patent rights under

the agreement. Accordingly, petitioner is entitled to treat the consideration received for the transfer of such patent rights as long-term capital gains.[4]

Know-how which is either secret or which is transferred incident to the transfer of patents is "property" for purposes of sections 1221 and 1231. *United States Mineral Products Co. v. Commissioner, supra; Heil Co. v. Commissioner,* 38 T.C. 989, 1003 (1962). Where services are performed subsidiary and ancillary to the transfer of patent rights and proprietary know-how, they take on the nature of the patent rights and know-how as "property." *United States Mineral Products Co. v. Commissioner, supra* at 199. Likewise an agreement to assign future patents and know-how incident to the transfer of existing patents and know-how takes on the nature of the patent. *PPG Industries, Inc. v. Commissioner, supra* at 1016; *Heil Co. v. Commissioner, supra.*

However, in the instant case, the transfer under the agreement of the right to use petitioner's know-how in Japan did not constitute a sale or exchange within the meaning of section 1221 or section 1231. In *PPG Industries, Inc. v. Commissioner, supra,* the taxpayers in each of five agreements transferred patented and unpatented technology to its Swiss subsidiary. Two of such agreements involved primarily patented technology. As to four of such agreements, we held that their termination sections referred to the subject matter of the whole agreement rather than to a fragment of it (the taxpayer's obligation to transfer after-acquired technology). We held further (55 T.C. at 1014) that "the transfer of unpatented technology under each of the four agreements was for a fixed period of years and that such transfers did not convey all substantial rights in the subject matter covered by the agreement."

We conclude likewise that the transfer of know-how in the instant case was for a limited period of time. Article 8 of the agreement states "this Agreement * * * shall continue for a period of six (6) years" and may be extended if the parties are mutually agreeable. Petitioner argues that such termination clause concerned only a fragment of the agreement and merely provided the length of time for Yawata's making royalty

---

[4]Respondent has not argued that petitioner failed to meet the holding period requirements or that such patents were held by petitioner primarily for sale to customers in the ordinary course of business.

payments. We must reject such argument. In *Pickren v. United States, supra,* the Fifth Circuit Court of Appeals stated (378 F.2d at 600):

> In determining the intention of the parties to a contract, the court should consider the language of the contract in its entirety. [Fn. ref. omitted.]

Article 6 specifically provided that Yawata should pay percentage (royalty) payments for the second through the sixth years of the agreement. Therefore, if we were to accept petitioner's interpretation of article 8, such article would be redundant to the extent that it provides for termination after 6 years, and we believe to the extent that it provides for an extension upon the mutual agreement of the parties, such provision for extension would have been placed in article 6, rather than a separate article, if the parties had intended the meaning which petitioner proposes.

We have also considered the possibility that the article 8 termination clause was included merely to limit the period of time during which petitioner was obligated to transfer new developments to Yawata, but we are unable to conclude that such interpretation is correct. We must read the agreement in its entirety and the inclusion of the first sentence in article 3 is inconsistent with such interpretation. Such sentence reads:

> ARTICLE 3. Exclusiveness and Territory.
> O'Brien *for the duration of this Agreement,* hereby grants to Yawata, which accepts, the exclusive right to manufacture and sell "PRODUCT" in Japan without the right to permit others to do so except its own subsidiaries, it being understood that O'Brien shall not reserve the right to manufacture and sell "PRODUCT" in Japan. [Emphasis supplied.]

If the parties had intended a transfer of petitioner's know-how in perpetuity and had provided for it elsewhere in the agreement, such sentence in article 3 would certainly have been omitted since it would provide no additional rights to Yawata and would, in fact, conflict with a grant of know-how in perpetuity.

We cannot find any other provisions in the agreement which deal with the length or exclusivity of the transfer of petitioner's know-how. A "perpetual and exclusive" transfer of petitioner's know-how is not indicated merely by the fact that the agreement did not provide for the reversion of such know-how to petitioner upon termination. *Taylor-Winfield Corp. v. Commis-*

*sioner*, 57 T.C. 205, 217 (1971), affd. 467 F.2d 483 (6th Cir. 1972); *PPG Industries, Inc. v. Commissioner, supra* at 1014. While Yawata will retain its knowledge of petitioner's know-how after the termination of the agreement (and no contract clause could provide otherwise), petitioner will then be free to sell such information to others for use in Japan. *Bell Intercontinental Corp. v. United States, supra.*

Under article 2 of the agreement Yawata could not disclose any of the know-how obtained from petitioner except to its own subsidiaries. There is no provision, other than the first sentence in article 3, which provides Yawata the exclusive right to use petitioner's know-how in Japan and even this provision does not specifically give Yawata the right to prevent unauthorized disclosure of the know-how. The termination of Yawata's exclusive right to use petitioner's know-how for the production and sale of partition systems in Japan pursuant to article 3 and the restriction on Yawata's right to disclose, even in Japan, the know-how obtained from petitioner indicate that petitioner retained a substantial right of value in such know-how. *Taylor-Winfield Corp. v. Commissioner, supra* at 218–219.

Although we have found that petitioner's partition systems could not be manufactured without the use of petitioner's patented feature this fact alone does not establish that the right to disclose the know-how had no practical or material value unless such know-how was disclosed together with the transfer of the Japanese patent rights. We believe much of the transferred know-how was applicable to the manufacture of partition systems in general. We think that a company wishing to enter the partition systems business would pay a substantial sum for the know-how alone. Moreover, upon termination of the agreement, petitioner's new developments will not be transferred to Yawata and we believe the know-how transferred under the agreement will be valuable in conjunction with the patents on these new developments. Since petitioner has not proved that the right to disclose its know-how for use in Japan, which was to revert to it upon termination of the agreement, no longer had any practical or material value after it had sold its Japanese patent rights to Yawata, we hold that petitioner retained a substantial right in its know-how transferred under the agreement. *Bell Intercontinental Corp. v. United States, supra* at 1021; *Taylor-Winfield Corp., supra* at 217. Accordingly,

petitioner's transfer of its know-how did not constitute a sale, it was a license, and the consideration received for such transfer is ordinary income.

Although we have held that petitioner sold its Japanese patent rights to Yawata under the agreement, petitioner, who has the burden of proof, Rule 142(a), Tax Court Rules of Practice and Procedure, has failed to prove how much, if any, of the $25,000, which Yawata paid for the patent rights and know-how together, should be allocated to the transfer of such patent rights. *PPG Industries, Inc. v. Commissioner, supra* at 1015 n.23. However, we have found that Yawata negotiated for *both* petitioner's Japanese patent rights and its know-how to enter the partition systems business. Therefore, it is clear that both such patent rights and know-how had substantial value to Yawata and that a part of the $25,000 payment is attributable to each. Using our best judgment and weighing the uncertainties heavily against petitioner who had the burden of proving the proper allocation, we find that $10,000 of the $25,000 payment is attributable to petitioner's sale of its Japanese patent rights and that such amount, less a pro rata share of the sales expenses, should be treated as capital gains.

*Decision will be entered under Rule 155.*