ALVIS KACZMAREK AND ALEITA KACZMAREK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaczmarek v. Comm'r
Docket No. 6209-77
United States Tax Court
T.C. Memo 1982-66; 1982 Tax Ct. Memo LEXIS 673; 43 T.C.M. (CCH) 501; T.C.M. (RIA) 82066; 218 U.S.P.Q. (BNA) 169; February 11, 1982. *673 K received royalties and a license fee under an agreement by which he transferred the right to make, sell, and use in Japan an invention (which was the subject of a patent application in Japan) as well as related technology, and know-how. The parties have stipulated that a patent in Japan has a term of 15 years. K retained the option to cancel the agreement upon giving 90 days notice at the end of 10 years. Held: K did not transfer to the licensee all substantial rights in the invention, technology, and know-how. Thus, amounts received under the agreement are not entitled to preferential treatment as long-term capital gains. Secs. 1235, 1222(3), I.R.C. 1954. Leonard Cuttone, for the petitioners. Val J. Albright, for the respondent. CHABOT
*169 MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal income tax against petitioners for 1973 in the amount of $ 17,327. After concessions by both sides, the issues for decision are as follows: (1) Whether amounts received under an agreement with a Japanese company with respect to an invention and related technology and know-how, qualify for treatment as long-term capital gains under section 1235 *674 or 1222; [1] and (2) Whether costs incurred in obtaining a Canadian patent for the same invention should be amortized over a seven-year or a seventeen-year period. [2]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition herein was filed, petitioner Alvis Kaczmarek (hereinafter sometimes referred to as "Kaczmarek") resided in Wood Dale, Illinois, and Aleita Kaczmarek resided in Elmhurst, Illinois. Petitioners were husband and wife during 1973 and filed a *170 joint income tax return for that year; by the time of the trial in the instant case they were divorced. Before and during *675 1973, Kaczmarek was engaged in the invention, design, and development of an industrial shredding machine (hereinafter sometimes referred to as "the Refuse Reducer")--a machine which shreds materials such as paper, cardboard cups, wood, rubber automobile tires, and other industrial scrap or refuse. The Refuse Reducer was first put into operation by October of 1970. 1. Japanese Agreement
On September 8,1971, Kaczmarek applied for a Japanese patent covering the Refuse Reducer. The parties have stipulated that the life or term of any patent or design right granted by Japan is fifteen years. On October 23, 1972, Kaczmarket and K. Brasch & Company, Ltd. (hereinafter referred to as "Brasch"), a Japanese company with offices in Tokyo, Japan, entered into a written agreement (hereinafter referred to as "the Brasch agreement"), subject to the approval of the Japanese government, concerning rights relating to the Refuse Reducer. Pertinent terms of this agreement are as follows: LICENCE [sic] AGREEMENT
WITNESSETH THAT WHEREAS, Licensor [Kaczmarek] represents that Licensor is the true and full owner of the invention disclosed and claimed, being a Refuse Reducer machine, for which Licensor *676 has applied for Letters Patent in the Patent Office of Japan, under Serial No 46-69019 on the 8th day of September, 1971, a copy of which is hereto attached and marked Exhibit A; and WHEREAS, Licensee [Brasch] desires to acquire exclusive licensing rights covered by said patent in Japan; NOW THEREFORE, the parties hereto have agreed and do hereby agree as follows: ARTICLE I - LICENSE
1. Licensor agrees to grant and does hereby grant to Licensee, an irrevocable, full, sole and exclusive right and license to make, or have made, use and sell in Japan, Refuse Reducer machines, embodying each of said inventions disclosed and claimed in said patent applications or modifications thereto from this date forth to the end of the life of any patent or patents that may hereafter be granted pursuant to said application or to any subsequent applications upon improvements on said inventions or modifications thereof. ARTICLE II - DRAWING, TECHNICAL DATA, ASSISTANCE AND KNOW-HOW
1. Promptly upon the execution of this agreement, Licensor will deliver to Licensee a complete set of manufacturing drawings, technical data and know-how of the Refuse Reducers being used by Licensor in Licensor's production *677 and manufacture of said Refuse Reducers and warrants that said items will be the same used by Licensor, and that same will include without limitation, assembly drawings, detail drawings, parts lists, processes, specifications, etc. 7. The exclusive rights granted with respect to the unlimited right to use said drawings, technical data and know-how shall be irrevocable and non-cancellable by Licensor, so long as this agreement or any part thereof is in full force and effect and payments are being made hereunder to Licensor. ARTICLE IV - TERMINATION
1. This agreement shall become binding upon both parties from the date of approval of this agreement by the Japanese Government and shall continue in full force for ten (10) years from such date. Thereafter this agreement shall continue in force for successive periods of two (2) years, subject to the approval of the Japanese Government, unless and until terminated by Licensor by giving to Licensee not less than ninety (90) days notice in writing expiring at the end of the said ten-year period or at the end of any subsequent period. 2. Licensee shall have the right to cancel this agreement at any time without cause by giving to Licensor *678 not less than ninety (90) days notice in writing. 3. If at any time either party shall be in default of this agreement and shall not remedy such default within a grace period of thirty days following receipt of notice thereof, the other party may terminate this agreement by notice in writing until fifteen (15) days following said grace period. *171 ARTICLE VII - PATENT INVALIDITY
4. In the event that Licensee does not pay commissions when they become due, Licensee shall then cease to make and sell Refuse Reducers and shall not either directly or indirectly, through any of its associates, divisions, subsidiaries or any other person engage in the manufacture and sale of Refuse Reducers for a period of seventeen years. ARTICLE IX - ARBITRATION
Any controversy or claim arising out of, or relating to, this agreement or the breach thereof shall be settled by arbitration in Japan, in accordance with the rules, then obtaining, of the Japan Commercial Arbitration Association and judgment upon the reward rendered may be entered in the highest court of the forum, state or federal, having jurisdiction. Each arbitration proceeding hereunder shall be conducted by three arbitrators selected from *679 the panel of arbitrators of the Japan Commercial Arbitration Association, at least one of whom shall be a patent attorney. Excepted from arbitration proceedings shall be the question of the validity of any patent or patents or claim or claims thereunder which are now or shall later become subject to this agreement by modification, amendment or by being a patent related to Refuse Reducers. ARTICLE X - ENTIRE AGREEMENT
This agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof. Neither of the parties shall be bound by any conditions, definitions, warranties or representations other than as expressly provided for in this agreement or as duly set forth on, or subsequent to, the effective date hereof, in writing and signed by a proper officer of the party to be bound thereby. ARTICLE XI - GOVERNING LAW
This agreement shall be governed by an interpreted in accordance with the State of Illinois, and the English version thereof shall control. If any provision of this agreement shall be invalid as being in contravention of any applicable law, such provisions shall be ineffective to the extent that they are so invalidating the remaining *680 provisions of this agreement. Pursuant to the Brasch agreement, Kaczmarek received $ 56,800 in 1973, which consisted of a $ 52,000 license fee and $ 4,800 in royalties. Petitioners reported the $ 56,800 as long-term capital gain on their 1973 joint income tax return. On June 4, 1975, respondent initiated the audit of petitioners' 1973 income tax return that resulted in the instant case. This audit was concluded on October 7, 1976. During this audit, petitioners presented a copy of the Brasch agreement to respondent's agent. In November 1976, Kaczmarek and Brasch entered into the following agreement (hereinafter sometimes referred to as "the 1976 amendment"): AMENDMENT TO LICENSE AGREEMENT, Dated Oct. 23, 1972 BETWEEN [Kaczmarek], as Licensor, and [Brasch], as Licensee
In order to express the true intentions of Paragraph 1, of Article IV of the above Agreement, the parties hereby delete the entire said Paragraph 1, to be replaced with a new Paragraph 1, as follows: "1. This agreement shall become binding on both parties from the date heereof [sic] upon approval of the Japanese Government and shall continue in force for the full life of the patent". This amendment shall become *681 a part of the original License Agreement above-mentioned of the parties entered into and effective on Oct. 23, 1972, the same as if written on said date. The 1976 amendment to the Brasch agreement was drafted by Leonard Cuttone (hereinafter referred to as "Cuttone"), the attorney who represents petitioners in the instant case. This amendment was a consequence of a series of written communications between Kaczmarek and Cuttone, on the one side, and Brasch on the other. These communications specifically refer to petitioners' income tax dispute with respondent over the proper Federal income tax characterization--ordinary income versus long-term capital gain--of the $ 56,800 received by Kaczmarek in 1973 from Brasch. The notice of deficiency arising from the audit and which is the basis for the instant case was mailed on April 4, 1977. In that notice of deficiency, respondent determined *172 that the $ 56,800 (less allowable amortization) received by Kaczmarek from Brasch was ordinary income. The 1976 amendment was first presented to the Internal Revenue Service on May 4, 1977. The Japanese patent application was denied in 1974. On July 9, 1974, Kaczmarek reapplied for a Japanese patent, *682 covering the Refuse Reducer; this application was still pending at the time of the 1976 amendment. Kaczmarek received the following amounts under the Brasch agreement: 1973--$ 56,800; 1974--$ 4,800; 1975--$ 9,600; 1976--$ 9,600; and 1977--$ 4,800. Kaczmarek and Brasch specifically considered the substance of Article IV, paragraph 1 of the Brasch agreement; when they executed the Brasch agreement, they intended that the initial term of the agreement be for ten years (and not fifteen years). 2. Canadian Patent
In 1972, a Canadian patent was granted to Kaczmarek covering the Refuse Reducer. The parties have stipulated that the life or term of any patent granted by Canada is seventeen years. Kaczmarek and Galt-Canadian Woodworking Machinery, Ltd. (hereinafter referred to as "Galt"), a Canadian company, entered into a written agreement (hereinafter referred to as "the Galt agreement"), dated January 3, 1972, concerning rights related to the Refuse Reducer. Pertinent terms of this agreement are as follows: WITNESSETH
WHEREAS, Licensor [Kaczmarek] represents that Licensor is the true and full owner of the inventions disclosed and claimed, being a Refuse Reducer machine, for which Licensor *683 has applied for Letters Patent in the Patent Office of Canada, under Serial No. 124882 on the 12th day of October, 1971, a copy of which is hereto attached and marked Exhibit A; and WHEREAS, Licensor has also applied for a patent in the United States of America and other countries; and WHEREAS, Licensee [Galt] desires to acquire exclusive licensing rights covered by said patent in Canada: NOW THEREFORE, the parties hereby mutually agree as follows: ARTICLE I - LICENSE
Licensor agrees to grant and does hereby grant to Licensee an irrevocable, full, sole and exclusive right and license to make, use and sell in and throughout the country of Canada Refuse Reducer machines embodying each of said inventions disclosed and claimed in said patent applications or modifications thereof from this date forth to the end of the life of any patent or patents that may hereafter be granted pursuant to said application or to any subsequent applications upon improvements on said inventions or modifications thereof. ARTICLE IV - TERMINATION
1. Licensee shall have the right to cancel this agreement at any time without cause by notice in writing to Licensor. 2. Licensor shall have no right of termination *684 or of cancellation except for default as provided herein and except for bankruptcy or receivership of Licensee. On their income tax return for 1973, petitioners claimed a deduction "to depreciate" the costs attributable to obtaining the Canadian patent using a seven-year useful life. Their capital transactions computation was as follows: Received from Canadian patent transaction
$ 6,000 Received under Brasch agreement
56,800 $ 62,800 Less: Costs of $ 61,411 amortized over
seven years
(8,773)
Net gain
$ 54,027 Pre-1970 long-term capital loss carryover
(10,589)
$ 43,438 One-half
n3 $ 21,729 Less: pre-1970 capital loss carryover
applicable against ordinary
income
1,000 Long-term capital gain
[3] $ 20,729 Respondent determined that there was no net gain from the sale of capital assets, and that petitioners were entitled to a $ 1,000 capital loss deduction. OPINION 1. Japanese Agreement
Petitioners maintain that they are entitled to treat the amount received in 1973 from Brasch as long-term capital gain under either section 1235 or 1221 because Kaczmarek transferred all substantial rights in Japan *173 relating to the Refuse Reducer. Petitioners assert *685 that (1) Kaczmarek wanted to contract with Brasch for fifteen years but Brasch insisted that the term of their agreement be only ten years, and (2) the 1976 amendment makes it clear that both Kaczmarek and Brasch intended the Brasch agreement to be for a term of fifteen years. Respondent maintains that Kaczmarek's right to terminate the Brasch agreement at the end of ten years precludes a determination that he transferred all substantial rights. As a result, respondent argues, there was no sale or exchange and the amount received is taxable as ordinary income. We agree with respondent. The Brasch agreement involves the right to use a bundle of asserts relating to the Refuse Reducer, including a pending patent application, manufacturing drawings, technical data, and knowhow, in order to make, use, and sell Refuse Reducers. The long-term capital gain tax treatment of payments as consideration for transfers of rights to patents is covered by section 1235(a); [4] *687 the treatment of such payments as to unpatented inventions, technical data, secret processes, and trade secrets is not specifically covered by statute. It is settled, however, that transfers of unpatented technology are treated *686 for tax purposes in a manner akin to that afforded transfers of patents.[5]Pickren v. United States,378 F.2d 595, 599 (CA5 1967); Taylor-Winfield Corp. v. Commissioner,57 T.C. 205, 213 (1971), affd. by published order 467 F.2d 483 (CA6 1972). See Glen O'Brien Partition Co. v. Commissioner,70 T.C. 492, 502 (1978); PPG Industries, Inc. v. Commissioner,55 T.C. 928, 1012 (1970); section 1.1235-2(a), Income Tax Regs.
Under section 1235, payments received as consideration for transfer of all substantial rights to a patent are taxed as long-term capital gain. However, the statutory phrase "transfer * * * of all substantial rights to a patent", does not include a grant of patent rights under an agreement *688 where the transferor has the right to terminate the agreement at will before the patent expires. Bell Intercontinental Corp. v. United States,180 Ct. Cl. 1071, 1093-1094, 381 F.2d 1004, 1020-1021 (1967); Taylor-Winfield Corp. v. Commissioner,57 T.C. at 214; Young v. Commissioner,29 T.C. 850, 858-860 (1958), affd. 269 F.2d 89, 94 (CA2 1959); paragraphs (b)(1)(ii) and (b)(4) of section 1.1235-2, Income Tax Regs.[6]
Similarly, where a transfer agreement as to know-how, etc., is terminable by the *689 transferor at will before the end of the remaining life of the know-how, etc., there is no transfer of all substantial rights, and payments for the *174 transfer are ordinary income. Glen O'Brien Partition Co.,70 T.C. at 502-505. Determination of the character of the $ 56,800 received by Kaczmarek depends on whether under the Brasch agreement he retained the right to terminate the transfer before the end of the remaining life of the assets he transferred. In Pickren v. United States,supra,378 F.2d at 599, the court stated: The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention. * * * In ascertaining whether the agreement gives only a license to use an invention or secret formula, or transfers all substantial rights therein, the language of the agreement in its entirety should be considered; the terminology used may be of great significance. However, the label or name the agreement bears is not determinative; nor is the form thereof necessarily conclusive. Taylor-Winfield Corp. v. Commissioner,57 T.C. at 214-215. Applying *690 these principles, we must examine the Brasch agreement and its factual context to ascertain whether Kaczmarek and Brasch intended to enter into a sale or a license with respect to the Refuse Reducer. We believe the evidence is clear that Kaczmarek retained the right to terminate the Brasch agreement at will at the end of the 10-year period. Article IV, paragraph 1, of the Brasch agreement provides as follows: This agreement shall become binding upon both parties from the date of approval of this agreement by the Japanese Government and shall continue in full force for ten (10) years from such date. Thereafter this agreement shall continue in force for successive periods of two (2) years, subject to the approval of the Japanese Government, unless and until terminated by Licensor by giving to Licensee not less than ninety (90) days notice in writing expiring at the end of the said ten-year period or at the end of any subsequent period. [Emphasis added.] Kaczmarek testified, and petitioners assert on brief, that Kaczmarek offered to transfer his rights for fifteen years, the stipulated full life of a patent in Japan (following the precedent of the Galt agreement as to the full life *691 of a patent in Canada), but that Brasch refused to enter an agreement for more than ten years. It is not apparent to us what business logic led to this juxtaposition of the parties to the Brasch agreement, since (1) Brasch had the right to achieve this result anyway, because Brasch could cancel the agreement at any time on 90-days notice, under Article IV, paragraph 2, and (2) the ten-year provision embodied in Article IV, paragraph 1, served to give Kaczmarek (and not Brasch) greater flexibility, hence, greater bargaining power. Be that as it may, on the basis of the record as a whole (but especially Kaczmarek's testimony) we are convinced that the ten-year termination provision was specifically agreed to by Kaczmarek and Brasch and was intended by them to be a part of the Brasch agreement. At best, Kaczmarek may have tried to transfer everything for fifteen years, but he did not succeed in doing so.We conclude that the ten-year termination provision had the effect of enabling Kaczmarek to cancel the agreement at will at the end of the tenth year and similarly at the end of each second year thereafter. The record is practically devoid of evidence (other than hindsight evidence) *692 that, as of the time of the transfer the transferred know-how, etc., or the hoped-for patent, would have no useful life beyond the ten-year period. From the foregoing, we conclude that petitioners have failed to carry their burden of proving that Kaczmarek transferred, by the Brasch agreement, all substantial rights to the know-how, etc., or the hoped-for patent. See, e.g., Young v. Commissioner, 269 F.2d at 91, 93-94. Consequently, we conclude that the Brasch agreement was a license and not a sale. [7] Petitioners argue that the 1976 amendment is persuasive evidence of the intent of the parties at the time of the Brasch agreement, in 1972. The circumstances surrounding the adoption of that 1976 amendment make us extremely reluctant to give it any weight. Our *693 inquiry must focus on the intent, as of October 23, 1972, with which Kaczmarek and Brasch entered into the Brasch agreement. Pickren v. United States,378 F.2d at 600; Young v. Commissioner, 269 F.2d at 94. We note that the 1976 amendment was drafted after petitioners' tax return was audited and the consequences of the Brasch transaction were brought into question. The 1976 *175 amendment does not resolve an arguable ambiguity by explaining how the ten-year termination provision was intended to really be a fifteen-year provision; instead it strikes out Kaczmarek's carefully detailed rights to terminate the agreement, replacing them with a provision terminating at the end of the life of any patent granted. If in 1972 the parties had really intended to agree to what the 1976 amendment provided, it would have been far easier to draft and use the 1976 amendment language in the first place, rather than draft the detailed language appearing in the Brasch agreement. When we add to the picture the testimony of Kaczmarek that the parties indeed focussed on this issue in 1972, we are led to the conclusion that the 1976 amendment was merely an effort at post hoc tax planning. The 1976 amendment *694 changes the Brasch agreement. In the light of the rest of the record in the instant case, the 1976 amendment is consistent with our conclusion that the Brasch agreement, as properly construed, granted Kaczmarek the right to terminate the transfer at the end of ten years and at the end of each second year thereafter. Respondent objected to introduction of the 1976 amendment and other evidence presented to interpret the Brasch agreement, relying on Article X of the Brasch agreement (the "integration provision") and the parol evidence rule. Petitioners have taken the position that the Brasch agreement is ambiguous and evidence aliunde is admissable to resolve the ambiguity. We agree with petitioners on the evidence dispute (see, e.g., Pickren v. United States,378 F.2d at 601), but we conclude that the evidence thus admitted does not lead to the result petitioners seek; indeed, it tends to support respondent's position that the Brasch agreement was terminable by Kaczmarek at will at the end of ten years. Petitioners argue that any rights retained by Kaczmarek were necessary for "security purposes" to insure that the licensee would continue to make payments. The Brasch agreement *695 contains several provisions arguably for such purposes (e.g., Article II, paragraph 8, which deals with return of know-how if the agreement fails or becomes unenforceable, and Article IV, paragraph 3, which provides that if either party defaults and does not cure the default within a grace period of 30 days from notice thereof, the other party may terminate the agreement in writing "until 15 days following said grace period"). We are not persuaded that the ten-year termination provision was necessary for or was intended for "security purposes." See Glen O'Brien Partition Co. v. Commissioner,70 T.C. at 502-503. Petitioners also attempt to distinguish between a patent and a pending patent application in determining whether there is a transfer of all substantial rights under section 1235. They argue that when the Brasch agreement was executed, the Refuse Reducer fell in the latter category and had a useful life of at most ten years, not the stipulated 15-year life of a Japanese patent.On the record in the instant case, petitioners have failed to convince us that as of October 23, 1972, the useful life of the Refuse Reducer was ten years or less. See Pickren v. United States,378 F.2d at 600; *696 Young v. Commissioner, 269 F.2d at 94. In asserting that Kaczmarek transferred all substantial rights to the invention in Japan, petitioners point to the parties' stipulation that the allowable 1973 amortization of Japanese invention, design, and development costs is one-seventh of the total of these costs. We are unaware of the reasons underlying this partial settlement, which was filed some time after the trial. Respondent's briefs, filed after the partial settlement, do not reflect any understanding that the partial settlement as to 1973 constituted an implicit concession as to useful life as of October 23, 1972. Since the partial settlement was filed some time after the end of the trial, the fact of the partial settlement could not have affected petitioners' presentation of evidence. The evidence in the record in the instant case is not sufficient to carry petitioners' burden of proof and the partial settlement does not remedy petitioners' shortfall in this respect. Finally, petitioners argue that an invention not patented is, under section 1221, a long-term capital asset with "no ascertainable life", and that there was a sale of Kaczmarek's rights in this capital asset. Essentially, *697 this question is sinilar to what has been discussed supra, whether Kaczmarek transferred all substantial rights in the know-how, etc. Our reasons for concluding Kaczmarek did not transfer all substantial rights in the Refuse Reducer to Brasch apply with no less force to petitioners' section 1221 capital asset contention. Glen O'Brien Partition Co. v. Commissioner,70 T.C. at 500, 502-503. Accordingly, we hold that the amounts received by Kaczmarek in 1973 under the Brasch agreement do not qualify for treatment as long-term capital gains, and must be taxed as ordinary income (subject to allowable amortization--see note 2, supra). On this issue, we hold for respondent. 2. Canadian Patent
We decided in issue 1, supra, that the *176 amounts received in 1973 by Kaczmarek under the Brasch agreement constitute ordinary income. Because of petitioners' long-term capital loss carryovers to 1973 and the limitation on capital loss deductions under section 1211 as in effect for 1973, the net effect on petitioners' adjusted gross income and taxable income is a $ 1,000 reduction however we decide the Canadian patent issue. [8] *698 Under these circumstances, we do not decide this issue. To reflect concessions by the parties, and in accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable year in issue.↩
2. The parties have agreed to allocate total costs of $ 61,411 as follows: $ 30,706 attributable to the Canadian patent and $ 30,705 attributable to the Japanese agreement. They have agreed that one-seventh of the costs allocable to the Japanese agreement constitutes allowable amortization for 1973, deductible against 1973's income from the Japanese agreement.↩
3. Presumably, the amounts should be $ 21,719 and $ 20,719.↩
4. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General.--A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are-- (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. [The subsequent amendments of this provision (by subsecs. (b)(1)(V) and (b)(2) of sec. 1402 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731, 1732), changing "6 months" to "9 months", and then to "1 year", do not affect the instant case.] 5. Such technology may constitute a capital asset ( Ofria v. Commissioner,77 T.C. 524, 535, 542 (1981)) and, if it is transferred in a transaction that constitutes a sale or exchange, than long-term capital gain treatment may result under section 1222(3), which provides as follows: SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. For purposes of this subtitle-- (3) Long-term capital gain.--The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. [The subsequent amendments of this provision (by sec. 1402(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731), changing "6 months" to "9 months", and then to "1 year", do not affect the instant case.]↩
6. Sec. 1.1235-2 Definition of terms. For the purposes of section 1235 and sec. 1.1235-1-- (b) All substantial rights to a patent. (1) The term "all substantial rights to a patent" means all rights (whether or not then held by the grantor) which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The term "all substantial rights to a patent" does not include a grant of rights to a patent-- (ii) Which is limited in duration by the terms of the agreement to a period less than the remaining life of the patent; (4) The retention of a right to terminate the transfer at will is the retention of a substantial right for the purposes of section 1235↩.
7. Similar facts have led this Court to similar conclusions in Glen O'Brien Partition Co. v. Commissioner,supra;Taylor-Winfield Corp. v. Commissioner,supra.See Martini v. Commissioner,38 T.C. 168, 171 (1962). The Court of Claims has dealt similarly with such matters. Compare Bell Intercontinental Corp. v. United States,supra, with Hooker Chemicals and Plastics Corp. v. United States,219 Ct. Cl. 161, 591 F.2d 652↩ (1979).
8. Under respondent's approach (seventeen-year amortization period), petitioners' capital transactions computation appears to be as follows: Received from Canadian patent transaction
$ 6,000 Less: Costs of $ 30,706 (see note 2,
supra) amortized over 17 years
(1,806)
$ 4,194 Long-term capital loss carryover
(10,589)
Long-term capital loss as limited under sec. 1211
(5,194)
Net effect on taxable income
$ (1,000)
Under petitioners' approach (seven-year amortization period), petitioners' capital transactions computation appear to be as follows: ↩
Received from Canadian patent transaction
$ 6,000 Less: Costs of $ 30,706 (see note 2,
supra) amortized over 7 years
(4,387)
$ 1,613 Long-term capital loss carryover
(10,589)
Long-term capital loss as limited under sec. 1211
(2,613)
Net effect on taxable income
$ (1,000)